# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-1913/1972

_____

| | | |
|---|---|---|
| Marshall M. Chernin; | * | |
| Ida Raye Chernin, | * | |
| | * | |
| Cross-Appellants/Appellees, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| United States of America, | * | |
| | * | |
| Appellant/Cross-Appellee. | * | |

_____

Submitted: March 11, 1998
Filed: July 10, 1998

_____

Before WOLLMAN and HANSEN, Circuit Judges, and GOLDBERG,[1] District Judge.

_____

GOLDBERG, District Judge.

This is a tax refund dispute. Marshall M. Chernin ("taxpayer") and Ida Raye Chernin, his wife, filed this action, seeking a refund for taxes levied and collected by the Internal Revenue Service ("IRS") during the years 1979 to 1983.[2] Taxpayer asserts

_____

[1]The Honorable Richard W. Goldberg, Judge, United States Court of International Trade, sitting by designation.

[2]Ida Raye Chernin is a party to this action only because joint federal tax returns were filed by the couple during the year in question.

that refunds are due for taxes paid on income reported in 1982 on two alternative grounds: either because (1) in 1982, he lost the unrestricted right to funds that he had previously claimed as income; or (2) in 1982 he transferred funds to contest an "asserted liability." The United States counters that taxpayer does not qualify for a refund in the first instance because he never repaid the disputed funds that he had previously claimed as income. In the second instance, the United States maintains that if the taxpayer is entitled to a refund for funds transferred to secure an "asserted liability" that he contested, then (1) the refund should only be allowed for the tax year 1983, not 1982; (2) the deduction should be allowed as a non-trade loss, not as a business loss; and (3) this court does not have jurisdiction to consider whether taxpayer is entitled to a refund for net operating losses carried back from 1982 to 1979. The district court first rejected taxpayer's claim that a refund is due for funds to which taxpayer allegedly lost an unrestricted right to use. However, the district court still granted summary judgment in taxpayer's favor, concluding that a refund is due for funds transferred to contest an "asserted liability." The district court also accepted taxpayer's claim that the deduction is allowable as a business loss and that a refund is due for net operating losses. We affirm in part and reverse and remand in part.

I.

Taxpayer served as the general manager for Long Prairie Packing Company ("LPP"), a Minnesota corporation, from 1978 through 1982. Taxpayer believed that under an oral agreement with LPP he was entitled to annual bonus payments as part of his compensation. The bonus payment amounted to ten percent of LPP's annual pretax profits. Taxpayer distributed bonus payments to himself in accordance with the bonus plan throughout the years 1978 to 1981, and in November of 1982. Between 1978 and 1982, taxpayer's bonus compensation totaled $965,482. Upon receipt of these payments, taxpayer deposited the bonus proceeds in two separate accounts with two banks in Texas. Virtually all of the funds deposited in the Texas banks derived from the bonus compensation taxpayer received from LPP.

In November 1982, allegedly upon finding that taxpayer was appropriating funds to himself in a manner unauthorized by any agreement oral or otherwise, LPP terminated taxpayer's employment. To prevent taxpayer from disposing of the now contested bonus payments, LPP initiated several civil actions in state courts. In particular, LPP filed suit in Minnesota state court in 1982, claiming taxpayer misappropriated and embezzled funds from the company; taxpayer counterclaimed in this suit, alleging breach of contract. Simultaneously, LPP initiated a suit in Dallas County, Texas state court. In this later action, LPP moved the court to issue temporary restraining orders ("TROs"), prohibiting withdrawal of funds from the Texas bank accounts. The Texas state court granted LPP's motion and issued ten day TROs, which were extended on November 15, 1982 until the conclusion of a hearing on a preliminary injunction requested by LPP. The Texas banks filed counterclaims in interpleader against both LPP and taxpayer on November 22, 1982. Shortly thereafter, on December 10, 1982, LPP also successfully persuaded the Texas court to issue a writ of garnishment against taxpayer's accounts. The writ of garnishment specifically named the two Texas banks as garnishees of taxpayer's accounts.

Before the Texas state actions could run their course, however, LPP and taxpayer reached an interim settlement agreement in April 1983 whereby all the Texas state actions were dismissed, and the disputed funds from the Texas bank accounts were transferred to First National Bank in Minneapolis, Minnesota. In accordance with the April 1983 settlement agreement, these funds were placed in an escrow account to be held pending the outcome of the Minnesota state embezzlement litigation initiated by LPP. The funds placed in escrow pursuant to the settlement agreement totaled $1,066,570. A jury ultimately vindicated taxpayer in December 1990, finding that he properly distributed bonus payments to himself during the years 1978 to 1982 and that LPP breached its employment contract with taxpayer. Following the jury trial, LPP and taxpayer entered a settlement agreement whereby the funds in escrow, then totaling nearly $1.8 million, were released to taxpayer and damages in the amount of $6.5 million were awarded to taxpayer.

After prevailing in the embezzlement litigation, taxpayer paid in full his income tax for the years 1980 to 1983. Soon thereafter, in August 1991, taxpayer timely filed a Form 1040X amended return for 1982 with the IRS, seeking a $642,768 refund.[3] Taxpayer based his claim for refund on 26 U.S.C. § 1341, arguing that the TROs and the writ of garnishment inhibited his unrestricted right to the disputed funds in the Texas accounts. In his Form 1040X refund claim, taxpayer made clear that the amended return included a claim for deductions in prior years, specifically 1978 to 1981. In addition, taxpayer timely filed an amended return in October 1992 for the tax year 1983, seeking a refund of $560,145. Taxpayer also based this claim on section 1341; he also noted that the claim included amended deductions for the years 1978 to 1982. At a conference held in November 1992 between taxpayer and the IRS, the applicability of 26 U.S.C. § 461(f) as the basis for a refund in either 1982 or 1983 was discussed as well as the applicability of section 1341. On November 17, 1992, the IRS concluded that under either section 461(f) or section 1341, taxpayer failed to qualify for a refund of taxes paid for the year 1982 or 1983.[4]

Taxpayer challenged this ruling by filing suit in the district court in October 1994. The court below issued an opinion on August 6, 1996 on cross-motions for summary judgment. The court first ruled that taxpayer is not entitled to a refund under section 1341 because he never actually repaid LPP the funds from the Texas accounts. The court concluded that an actual restoration of funds to an obligee must occur before

---

[3]26 U.S.C. § 6511(a) provides that a claim for refund must be filed with the IRS within three years of the time the tax return was filed or two years from the time the tax was paid. Here, taxpayer paid his tax for the years 1980 to 1983 on February 12, 1991, and filed his refund claim on August 29, 1991, well within the alternative two-year time limit.

[4]The IRS granted one portion of taxpayer's 1983 claim. Specifically, the IRS allowed a claim under section 1341 for the proceeds of the sale of taxpayer's Florida condominium that were then transferred to LPP pursuant to a separate settlement agreement. Taxpayer had purchased the Florida condominium with bonus funds.

a taxpayer may obtain relief under section 1341. According to the court, neither the TROs or garnishment proceedings in Texas nor the transfer of funds to the escrow account in Minnesota operated to restore the disputed funds to LPP, the alleged obligee, and, hence, relief under section 1341 was not available to the taxpayer. The court then held, however, that taxpayer is entitled to a refund under section 461(f). The court noted that taxpayer meets all four statutory requirements for relief delineated in section 461(f), including the transfer requirement. Specifically, the court ruled that a transfer occurred when the parties agreed to place the disputed funds in an escrow account in April 1983. The court also rejected the United States' alternative argument that, assuming section 461(f) applies, the deduction allowable is as a loss incurred in a transaction entered into for profit, though not connected with a trade or business, under 26 U.S.C. § 165(c)(2), not as a trade or business loss under 26 U.S.C. § 165(c)(1).

In its opinion, the district court did not set the amount of refund due taxpayer. Instead, the court encouraged the parties to reach agreement as to the proper amount of the refund. Unable to reach a settlement, however, the parties submitted to the court their respective claims for the proper refund amount. The United States used the tax year 1983 as the basis for its refund calculation, concluding that the transfer giving rise to the deduction allowable under section 461(f) occurred by way of the escrow account in April 1983. Taxpayer based his refund calculation on the tax year 1982, concluding that the TROs and the writ of garnishment issued in 1982 amounted to a transfer within the meaning of section 461(f). Taxpayer also included in his claim a refund for net operating losses carried back from 1982 to 1979. Without further opinion, on January 29, 1997, the court entered summary judgment in favor of taxpayer for $1,536,768, an amount consistent with taxpayer's claim for refund. The United States appeals and taxpayer cross appeals from this decision.

II.

We review the district court's grant of summary judgment de novo. See, e.g., Bremen Bank & Trust Co. v. United States, 131 F.3d 1259, 1263 (8th Cir. 1997). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Because the parties have stipulated to the relevant facts, the questions on appeal solely concern whether the district court's judgment should be affirmed as a matter of law.

A.   The Record Demonstrates that a Transfer Within the Meaning of Section 461(f) Occurred in 1982.

In general, an accrual basis taxpayer may not deduct an expense until (1) all events have occurred that determine the fact of liability; (2) the amount thereof can be determined with reasonable accuracy; and (3) economic performance has occurred with respect to the expense. See Treas. Reg. § 1.461-1(a)(2). See also Dixie Pine Prods. Co. v. Commissioner, 320 U.S. 516 (1944) (holding that an expense is not deductible where the outcome of a liability is contingent upon the outcome of a contested lawsuit because the fact and amount of the expense cannot be ascertained). In 1961, the Supreme Court followed this general rule in United States v. Consolidated Edison Co., 366 U.S. 380 (1961), when it held that a contested liability, though paid, was not deductible until the outcome of the contest was determined. 366 U.S. at 390-92. In response to the Supreme Court's decision in Consolidated Edison, Congress carved out a narrow exception to the general rule through section 461(f). See S.Supp.Rep.No. 830 (1964), reprinted in 1964 U.S.C.C.A.N. 1868, 1913. This section of the tax code now provides that a taxpayer may take a deduction in the year of a transfer equal to the amount transferred if the taxpayer satisfies the following four requirements:

> (1) the taxpayer contests an asserted liability,
> (2) the taxpayer transfers money or other property to provide for the satisfaction of an asserted liability,

(3) the contest with respect to the asserted liability exists after the time of the transfer, and

(4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer . . . .

26 U.S.C. § 461(f).

The United States concedes that taxpayer meets the first, third, and fourth requirements for favorable treatment under section 461(f). Moreover, the United States does not contest that portion of the district court's opinion which held that a transfer with the meaning of section 461(f)(2) occurred in 1983 when the parties agreed to transfer the disputed funds to the escrow account at the First National Bank in Minneapolis in April 1983. The United States, however, argues that the district court erred when it granted summary judgment to taxpayer in the amount of $1,536,768, an amount that gave effect to taxpayer's claim that a transfer occurred in 1982. The United States contends no event gave rise to a "transfer" within the meaning of section 461(f)(2) in 1982 and, hence, taxpayer is only entitled to a deduction under this section for the tax year 1983. Specifically, the United States points to Treasury regulation § 1.461-2(c) as support for the proposition that neither the TROs nor the writ of garnishment issued in 1982 constitutes a transfer within the meaning of section 461(f)(2). Section 1.461-2(c) provides as follows:

(c) Transfer to provide for the satisfaction of an asserted liability.

(1) In general – A taxpayer may provide for the satisfaction of an asserted liability by transferring money or other property beyond his control (i) to the person who is asserting the liability, (ii) to an escrowee or trustee pursuant to a written agreement . . ., or (iii) to an escrowee or trustee pursuant to an order of the United States, any state or subdivision thereof, or any agency or instrumentality of the foregoing, or a court . . . . A taxpayer may also provide for the satisfaction of an asserted liability by transferring money or other property beyond his control to a court with jurisdiction over the contest. . . . In order for money or other property to

be beyond the control of a taxpayer, the taxpayer must relinquish all authority over such money or other property.

Treas. Reg. 1.461-2(c). Based principally on the language of the regulation, the United States claims taxpayer failed to take any action in 1982 that satisfies the transfer requirement.

We disagree. It is true that in its written opinion, the district court never examined whether taxpayer met the transfer requirement of section 461(f) for the year 1982. However, the district court effectively adopted this proposition when it issued a summary judgment order that gave effect to taxpayer's claim that a transfer occurred in 1982. From our review of the record, we are satisfied that the district court correctly adopted taxpayer's claim that a transfer within the meaning of section 461(f) occurred in 1982.

Section 461(f) is silent on the mechanics of the transfer requirement. And, in such situations, deference is generally accorded the interpretation of the agency charged with enforcing the statute. See, e.g., Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501 (1948) (stating that Treasury regulations in particular are entitled to deference as administrative interpretations of a statute). We agree and substantively do give deference to the existing regulation. Yet, this is not the end of the matter. The subtitle to the regulation explicitly begins, "[in] general." Treas. Reg. 1.461-2(c)(1). Both this circuit and the Ninth Circuit have reflected on the nomenclature preceding the regulation and reasoned that the provision thereby offers only an illustrative, rather than exhaustive, list of events that should be considered "transfers" for purposes of section 461(f)(2). See Varied Invs., Inc. v. United States, 31 F.3d 651, 653 (8th Cir. 1994); Chem Aero, Inc. v. United States, 694 F.2d 196, 198 (9th Cir. 1982) ("phrase preceding the listed methods of transfer, suggests that [the methods] are merely illustrative, not all-inclusive"). In line with this precedent, we continue to hold that

events other than those described in Treasury regulation 1.461-2(c)(1) may satisfy the transfer requirement of section 461(f)(2).

We now turn to the question of whether the TROs or the writ of garnishment, both issued in 1982, qualify as events outside the ambit of the regulation that still satisfy the statutory transfer requirement. As our framework for analysis, we employ the test set forth in Chem Aero and Varied Investments. In Chem Aero, the Ninth Circuit held that a taxpayer who posted an appeal bond was entitled to section 461(f) treatment. 694 F.2d at 198-200. In reaching this conclusion, the Ninth Circuit reasoned that by posting the appeal bond, the taxpayer transferred funds beyond his control in a manner that did not raise the specter of tax abuse. Id. at 199-200. Similarly, in Varied Investments, this court considered whether an escrow account set up to secure an appeal bond and only signed by one party satisfies the transfer requirement, notwithstanding that it is not a method delineated in Treasury regulation 1.461-2(c). Adopting the Ninth Circuit's formula in Chem Aero, this court reasoned that the escrow account set up by taxpayer removed the funds from taxpayer's control. Varied Invs., 31 F.3d at 654-55. Also, the court noted in Varied Investments that no evidence suggested taxpayer purposefully set up the escrow account to limit tax liability. Id. at 655. Thus, we consider whether the transfer requirement is satisfied by looking to see if the funds are "irrevocably parted with, provided that the manner of transfer is not open to the possibility of tax abuse." Chem Aero, 31 F.3d 653-54.

In this case, because we conclude the writ of garnishment standing alone satisfies the transfer requirement, the effect of the TROs is not probed. Here, the writ of garnishment issued by the Texas court effectively forced taxpayer to transfer funds. Indeed, the writ of garnishment did more than simply place the funds temporarily beyond taxpayer's control. The writ of garnishment shifted actual control over the funds from the taxpayer to the garnishees, the Texas banks. See Tex. Civ. Code Ann. § 4084 (West 1966) (after issuance of a writ upon the garnishee, "it shall not be lawful for the garnishee to pay to the defendant any debt . . . ."). See also Intercontinental

Terminals Co. v. Hollywood Marine, Inc., 630 S.W.2d 861, 863 (Tex. Ct. App. 1982) (citing Gause v. Cone, 11 S.W. 162, 163 (Tex. 1889) ("Once a writ of garnishment has been served a debtor may not by assignment or otherwise dispose of the funds in the hands of the garnishee.")); Chase Commercial Corp. v. Donald Benson Accessories, Inc., 69 B.R. 32, 34 (N.D.Tex. 1986) ("[T]he issuance and service of a writ of garnishment serves to trap funds in the hands of the garnishee which are due to a judgment creditor."). Moreover, once a writ of garnishment has been issued, the funds are held by the garnishee as an officer of the court. Intercontinental Terminals, 630 S.W.2d at 863. Thus, the writ of garnishment in effect transferred the funds from the taxpayer to the court.[5]

Finally, nothing in the record suggests that taxpayer sought to induce issuance of the writ so as to avoid tax liability. Rather, quite obviously, the transfer directly resulted from the exigencies of litigation and, hence, cannot be characterized as a tax avoidance scheme. We therefore conclude that the writ of garnishment issued by the Texas court in 1982 constitutes a transfer within the meaning of section 461(f)(2).

B.      The District Court Properly Held That Taxpayer's Deduction Under Section
        461(f) Is Otherwise Allowable as a Trade or Business Loss Under Section
        165(c)(1).

In and of itself, section 461(f) does not authorize a deduction. Rather, section 461(f) affects the timing of a deduction that is otherwise allowable under the tax code. See 26 U.S.C. 461(f)(4) ("[B]ut for the fact that the asserted liability is contested, a

_____

        [5]In this sense, it is worth noting that the transfer effected by the writ of garnishment falls within the methods of transfer listed in the regulation. That is, the funds were placed beyond taxpayer's control and under the control of a court because the writ transferred control of the funds from the taxpayer to an officer of a court. See Treas. Reg. 1.461-2(c) (providing that transfer of funds from the taxpayer to a court pending the outcome of a contest satisfies the transfer requirement).

deduction would be allowed for the taxable year of the transfer . . . .").  In this case, the district court held that taxpayer's transfer of funds to contest the liability entitled him to a deduction for a business loss under 26 U.S.C. § 165(c)(1).  The United States contests this ruling, claiming instead that taxpayer's transfer only entitles him to a deduction for a loss incurred in a transaction entered into for profit, though not connected with a trade or business under 26 U.S.C. § 165(c)(2).  The distinction is important because in calculating a net operating loss to be carried back to previous years, a taxpayer may take in full all of the deduction attributable to trade or business losses, whereas deductions not attributable to trade or business losses are only allowable to the extent the gross income is not derived from a trade or business.  See 26 U.S.C. § 172(c) and (d)(4).  In this case, taxpayer's claim for refund includes a net operating loss carryback from 1982 to the tax year 1979.  See infra Section II.C.  Thus, if the allowable deduction here is not for a business loss, taxpayer does not qualify for the claimed net operating loss carryback.

The United States first directs our attention to the language of section 461(f)(2), which requires that "the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability."  According to the United States, the plain language of this section requires that the nature of the allowable deduction must be determined by examining the asserted liability.  Thus, where funds are transferred to contest an asserted liability that concerns a business expense, a deduction for a business loss is allowable; conversely, where funds are transferred to contest an asserted liability that concerns a non-business loss, only a deduction for a non-business loss is allowable.  It is well established that repayment of embezzled funds only gives rise to a deduction for a non-business loss.  See, e.g., Kraft v. United States, 991 F.2d 292, 298 (6th Cir. 1993) (holding that repayment of embezzled funds is an expense deductible under 26 U.S.C. § 165(c)(2)); Stephens v. Commissioner, 905 F.2d 667, 670 (2d Cir. 1990) (same).  The United States thus asserts that here the funds were transferred to contest an asserted liability that involved a non-business expense, namely

embezzlement. And, therefore, the deduction allowable must be viewed as a deduction for a non-business loss under section 165(c)(2).

We are unpersuaded by the government's argument. First, contrary to the position of the United States, there is no language in the statute to suggest that determining the nature of the deduction is limited to analysis of the underlying liability, i.e., the embezzlement liability. Section 461(f) simply states that in the year of the transfer a deduction must have been otherwise allowable. See 26 U.S.C. § 461(f)(4). We are unwilling to read into the statute the government's novel corollary that the form of the deduction allowable in the year of transfer must be determined by the nature of the asserted liability.

Instead, in accord with settled principles of tax law, a transaction must be given effect based on what actually happened, not what might have occurred. See Donald E. Williams Co. v. Commissioner, 429 U.S. 569, 579 (1977) (quoting, Commissioner v. National Alfalfa Dehydrating, 417 U.S. 134, 148-49 (1974) ("[A] transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred."). Congress even endorsed this principle when it enacted section 461(f), stating that "[t]he objective of the reporting of items of income and deduction under the internal revenue laws generally is to realistically and practically match receipts and disbursements attributable to specific tax years." S.Rep.No. 830 (1964), reprinted in 1964 U.S.C.C.A.N. 1673, 1773.

The rationale underpinning this tax principle is especially evident in this case. For, if one were to look only to the year of transfer, i.e., 1982, the outstanding litigation underway at that time makes it impossible to determine if the funds transferred were embezzled funds or funds actually due taxpayer. Thus, it is not readily apparent if one looks solely to the year of the transfer whether the allowable deduction should be for a business loss or a non-business loss. But, when all events that impinged upon the transaction are considered, the form of the deduction that is most soundly grounded in

reality is easily discerned. Specifically, taxpayer was conclusively adjudged not to have embezzled the disputed funds by a jury before he filed the Form 1040X refund claim at issue here. In view of all events that actually occurred, it is therefore clear that taxpayer transferred funds owed to him as compensation, not embezzled funds. Accordingly, the district court properly construed taxpayer's transfer of funds to contest the asserted liability as a deduction for a business loss under section 165(c)(1).

Finally, the United States maintains this holding sets up a framework for administering section 461(f) that is unworkable. In particular, the United States claims this result potentially requires taxpayers and the IRS to hold tax years open until the contest over the asserted liability is resolved. This is not the case. In those instances where the ultimate determination as to the contested liability has yet to be made when taxpayer files his or her refund claim with the IRS, the nature of the deduction still must be determined upon careful review of all events consequent to the transaction. If the IRS determines that the current framework dictated by the statute is unwieldy, then its forum for redress is with Congress, not the judiciary.

C.      Taxpayer's Claim for a Net Operating Loss Carryback to 1979 Is Jurisdictionally Deficient.

Before the district court, taxpayer claimed that the deduction allowable under section 461(f) for the year 1982 results in a $23,784 loss. As discussed above, taxpayer claimed a refund for 1982 under section 165(c)(1), as a business expense. Therefore, taxpayer also included as part of his refund calculation a claim for net operating losses in 1982, which he carried back to 1979. This portion of the refund amounts to $9,206 plus interest by taxpayer's calculation. Without opinion, the district court granted taxpayer his refund request in its entirety, including the amount for the net operating loss carryback to 1979.

On appeal, the United States maintains for the first time that the district court erred when it accepted taxpayer's claim for a net operating loss carryback to 1979. The United States argues taxpayer failed to make a refund claim with the IRS for carryback losses, and, hence, the district court lacked jurisdiction to rule on this aspect of taxpayer's refund suit. Taxpayer counters that his refund claim for 1982 made clear that his tax liability for 1979 also was affected. Thus, taxpayer asserts that because his Form 1040X refund claim for 1982 included an informal claim for refund of taxes paid in 1979, he placed the IRS on notice and, as such, is entitled to a refund for the carryback losses and the interest accruing thereon. Moreover, taxpayer claims that the United States waived this argument when it failed to bring it to the attention of the district court.

Although the United States did not raise this jurisdictional argument before the district court, it is well settled that "the question of a court's jurisdiction over an action is non-waivable and may be raised at any point in the litigation." Berger Levee Dist., Franklin County, Missouri v. United States, 128 F.3d 679, 680 (8th Cir. 1997) (citing Bueford v. Resolution Trust Corp., 991 F.2d 481, 485 (8th Cir. 1995); Fed.R.Civ.P. 12(h)(3)). As a result, we must consider the United States' argument that the district court lacked subject-matter jurisdiction to issue a refund for the net-operating losses carried back from 1982 to 1979.

It is fundamental that the United States, as a sovereign, cannot be sued without its consent. See United States v. Mitchell, 463 U.S. 206, 212 (1983); Manypenny v. United States, 948 F.2d 1057, 1063 (8th Cir. 1991). Here, taxpayer filed his complaint with the district court, asserting jurisdiction under 28 U.S.C. § 1346(a). This section permits civil suits against the government for recovery of taxes "erroneously or illegally assessed or collected ." As stated by the Supreme Court in United States v. Dalm, 494 U.S. 599 (1990), however, section 1346(a)(1) "must be read in conformity with other statutory provisions which qualify a taxpayer's right to bring a refund suit upon

-14-

compliance with certain conditions." 494 U.S. at 601. Most importantly, 26 U.S.C. § 7422(a) proscribes a taxpayer's ability to maintain a refund suit as follows:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

26 U.S.C. § 7422(a). Accordingly, it is plain that the filing of a timely refund claim with the IRS in accord with section 7422(a) is a prerequisite to maintaining a tax refund suit. Indeed, the Supreme Court has squarely held this is a jurisdictional requirement that cannot be waived. Dalm, 494 U.S. at 602; United States v. Kales, 314 U.S. 186, 193 (1941). See also Fairley v. United States, 901 F.2d 691, 693 (8th Cir. 1990); Bruno v. United States, 547 F.2d 71, 74 (8th Cir. 1976); Essex v. Vinal, 499 F.2d 226, 231 (8th Cir. 1974).

Taxpayer here failed to comply in a timely manner with the statutory filing requirements for its claimed refund of net operating losses in 1982 carried back to 1979.[6] The statute governing the timeliness of taxpayer's claim for a refund is found in 26 U.S.C. § 6511(d)(2)(A). This section of the tax code mandates a "special period

---

[6]As support for its jurisdictional argument, the United States only briefly raises the timeliness issue and then only in its reply brief. Instead, the United States principally relies upon its assertion that taxpayer never actually filed a claim for net operating losses. Although as a general rule, we will not address arguments raised for the first time in a reply brief, see, e.g., Planet Prods., Inc. v. Shank, 119 F.3d 729, 732 (8th Cir. 1997), in this case we entertain the timeliness argument due to its jurisdictional nature.

of limitation" for refund claims arising out of net operating loss carrybacks. In pertinent part, this special provision states:

> If the claim for credit or refund relates to an overpayment attributable to a net operating loss carryback . . ., in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be that period which ends 3 years after the time prescribed by law for filing the return (including extensions thereof) for the taxable year of the net operating loss . . . .

26 U.S.C. § 6511(d)(2)(A). The taxable year in which taxpayer claims net operating losses is 1982. The prescribed deadline for filing 1982 individual tax returns was April 15, 1983; with extensions, the deadline for filing the return was October 15, 1983. See 26 U.S.C. §§ 6151(a) and 6161(a)(1); Treas. Regs. 20-6151-1(a) and 20-6161-1(a) (1982). From the record before the court, it appears taxpayer requested an extension and filed his tax return for 1982 in October 1983. Pursuant to the terms of section 6511(d)(2)(A), at the very latest then, taxpayer was required to make his claim for refund based on the net operating losses at issue here by October 15, 1986. Therefore, even accepting taxpayer's argument that the Form 1040X refund claim for 1982 taxes filed in 1991 constituted an informal claim for net operating losses carried back to 1979, we still would lack jurisdiction to grant taxpayer's refund request.[7] The claim

---

[7]Although never addressed by taxpayer, we can only surmise that he considered the timely filing of his refund claim for 1982 taxes under the two-year alternative time limit of section 6511(a) sufficient to qualify him for net operating loss carryback refunds. However, both the Sixth Circuit and the Fourth Circuit have squarely held that the two-year limitation in section 6511(a) is inapplicable for purposes of considering the timeliness of refund claims for net operating losses. See Sachs v. United States, 941 F.2d 464, 466 (6th Cir. 1991); Longiotti v. United States, 819 F.2d 65, 67 (4th Cir. 1987). "The reference to subsection (a) that is contained in § 6511(d)(2)(A) cannot be read to expand the only limitation period contained in the [special net operating loss provision] – the three-year period measured from the date of [a] return was required to be filed." Sachs, 941 F.2d at 466. We agree. The structure of the tax code makes

for carryback losses, informal or otherwise, should have been filed by October 1986, not August 1991.  See Koss v. United States, 69 F.3d 705, 708 (3rd Cir. 1995) (finding that taxpayer failed to comply with the requirements of section 6511(d)(2)(A) in seeking a refund for a net operating loss carryback from the tax year 1977 when refund claim was not brought until 1991, ten years after 1981 deadline); Sachs v. United States, 941 F.2d at 466 (noting that taxpayer failed to comply with section 6511(d)(2)(A) by filing refund claim for a net operating loss carryback for 1981 in 1987, outside the three-year statutory window); Malonek v. United States, 923 F. Supp. 1462, 1465 (D. Wyo. 1996) (holding that because the special three-year limitation applies, for losses incurred in 1987 taxpayer had to file claim for net operating loss carryback refund by April 1991); Whitney v. United States, 920 F. Supp. 41, 44 (W.D.N.Y. 1995) (finding taxpayer's claim for a refund based on operating losses in 1989 untimely because it was filed after April 1993, the statutorily prescribed deadline for carryback refunds).  Therefore, by the plain terms of sections 6511(d)(2)(A) and 7422(a), the district court lacked jurisdiction to grant taxpayer's refund request for net operating losses in 1982 carried back to 1979. Accordingly, we reverse and remand to the district court with instructions to calculate the proper refund due taxpayer (i.e., the refund for 1982 taxes paid exclusive of the net operating loss carryback to 1979 and the interest accruing thereon).

D.    The District Court Properly Denied Taxpayer's Claim for a Refund under section 1341.

On cross appeal, taxpayer argues that he is entitled to an even greater refund for 1982 taxes under 26 U.S.C. § 1341, and that the district court erred in not granting a refund under this section of the tax code.  Briefly stated, Congress enacted section 1341

---

clear that the explicit three-year limitation in section  6511(d)(2)(A) is not meant to be expanded; the alternative two-year limitation listed in section 6511(a) applies to refund claims in general and should not be viewed as an alternative limitation for net operating loss claims.

in response to deficiencies associated with the so-called "claim of right" doctrine. In general, the claim of right doctrine requires a taxpayer to report as income money that he controls, yet to which competing claims may be made.

> Mr. Justice Brandeis, speaking for a unanimous Court in North American Oil Consolidated v. Burnet, 286 U.S. 417, 424 (1932), gave [the claim of right doctrine] its classic formulation. 'If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent.' Should it later appear that the taxpayer was not entitled to keep the money, Mr. Justice Brandeis explained, he would be entitled to a deduction in the year of repayment; the taxes due for the year of receipt would not be affected.

United States v. Skelly Oil Co., 394 U.S. 678, 681-82 (1969). Of course, the inequities that result from this doctrine are apparent. For example, under this doctrine a taxpayer who later claims a deduction would be entitled to a lesser tax benefit if tax rates were to increase in the intervening years or if taxpayer's position in the tax brackets elevated. Yet, prior to 1954, the potential hardships "were accepted as an unavoidable consequence of the annual accounting system." Id. at 682.

To lessen the taxpayer's burden, Congress enacted section 1341 in 1954. See H.R.Rep.No. 1337, at 86-87 (1954), reprinted in 1954 U.S.C.C.A.N. 4017, 4436-37. Section 1341 provides, in pertinent part, as follows:

> Computation of tax where taxpayer restores substantial amount held under claim of right.
>
> (a) General rule. – If –

(1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;

(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000, . . . .

Internal Revenue Code of 1954, Pub. L. No. 83-591, § 1341, 68A Stat. 3 (1954), 26 U.S.C. § 1341. If the taxpayer meets these three requirements, then he is entitled to either the equivalent of a refund for income tax paid in the earlier year, or a deduction from income in the year of repayment, whichever is more beneficial to the taxpayer. See 26 U.S.C. § 1341(a)(4)-(5).

Taxpayer maintains he qualifies for a deduction under section 1341. All parties agree that taxpayer satisfies the first and third requirements. The contest turns on whether taxpayer meets the second criteria. Of particular import, taxpayer insists that through the actions of the Texas court in 1982, he lost his "unrestricted right" to the disputed funds. Taxpayer then argues that the explicit language of section 1341(a)(2) requires only that "the taxpayer did not have an unrestricted right" to the disputed funds. Taxpayer maintains he therefore qualifies based on the plain language of section 1341. The district court rejected taxpayer's argument. According to taxpayer, however, the district court impermissibly read into the statute an additional requirement – a taxpayer only loses an unrestricted right to funds for purposes of section 1341(a)(2) when he or she repays or restores the disputed funds.

We disagree with the taxpayer. It is true that our starting place for analysis is the language of the statute itself. See, e.g., Connecticut Nat'l. Bank v. Germain, 503 U.S. 249, 253-54 (1992); United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241

-19-

(1989). And, when the language of the statute is clear and unambiguous, our analysis also should end here. See, e.g., Davis v. Michigan Dep't. of the Treasury, 489 U.S. 803, 808, n.3 (1989); Northern States Power Co. v. United States, 73 F.3d 764, 766 (8th Cir.), cert. denied, 117 S.Ct. 168 (1996). Yet, contrary to taxpayer's argument, the relevant statutory language here is not clear. Specifically, the language of section 1341(a)(2) makes no mention of how a taxpayer or the IRS is supposed to establish that the taxpayer does not have an unrestricted right to income. That is, from the statute's terms it is entirely ambiguous as to how a taxpayer might lose his or her unrestricted right to disputed funds.

Therefore, for purposes of section 1341(a)(2), it is appropriate to examine other legislative sources to ascertain the criteria Congress would have us use to determine whether or not a taxpayer has lost his unrestricted right to funds. In doing so, we first note that the legislative history is replete with references to repayment, restoration, and restitution. H.R. Rep. No. 1337 (1954), reprinted in 1954 U.S.C.C.A.N. 4017, 4113 ("The committee's bill provides that if the amount restored exceeds $3,000, the taxpayer may recompute the tax for the prior year, excluding from income the amount repaid," and "[E]xcluding the amount repaid from the earlier year's income is likely to have little, if any, tax advantage over taking a deduction in the year of restitution.") (emphasis added); S.Rep.No. 1622 (1954), reprinted in 1954 U.S.C.C.A.N. 4621, 4751 (adopting the same language contained in the House report). In addition, it is instructive to turn to the title of the statute to aid in resolving textual ambiguity. See INS v. Nat'l Ctr. for Immigrants' Rights, 502 U.S. 183, 189 (1991) (citations omitted) (stating that "the title of a statute or section can aid in resolving an ambiguity in the legislative text.") Here, the title to section 1341 reads, "Computation of Tax Where Taxpayer Restores Substantial Amount Held Under Claim of Right." 26 U.S.C. § 1341 (emphasis added). As with the legislative history, the title of the statute plainly indicates that a taxpayer must restore funds to establish that he or she has lost the unrestricted right to those funds.

Similarly, the regulations promulgated by the IRS to administer the statute require that taxpayer must actually repay funds to qualify for section 1341treatment. For instance, Treasury regulation § 1.1341-1(a)(1) provides that "restoration to another" is a prerequisite for eligibility under section 1341. And, Treasury regulation § 1.1341-1(e) explicitly states that "[t]he provisions of section 1341 and this section shall be applicable in the case of a taxpayer on the cash receipts and disbursements method of accounting only to the taxable year in which the item of income included in a prior year (or years) under a claim of right is <u>actually repaid</u>." (Emphasis added). We find reference to the regulations instructive because an agency's interpretation, when reasonable, is entitled to deference, especially where the statute is ambiguous. <u>See</u>, <u>e.g.</u>, <u>Rowan Cos., Inc. v. United States</u>, 452 U.S. 247, 252 (1981); <u>Commissioner v. Portland Cement Co. of Utah</u>, 450 U.S. 156, 169 (1981). Moreover, in the few instances where this issue has been discussed, the courts have also found that section 1341 requires actual repayment, restoration, or restitution. <u>See</u> <u>Kappel v. United States</u>, 437 F.2d 1222, 1226 (3rd Cir. 1971) ("The requirement that a legal obligation exist to restore funds before a deduction is allowable under the claim of right doctrine is derived from § 1341(a)(2) of the Code."); <u>Smith v. Commissioner</u>, 110 T.C. No. 2, 1998 WL 6147 (Jan. 12, 1998) ("Section 1341 provides relief to taxpayers who are forced to <u>repay</u> an item previously reported as income under a claim of right.") (emphasis added). We therefore conclude that under section 1341(a)(2), funds must actually be repaid to establish that the unrestricted right to those funds has been lost.

Finally, taxpayer claims that even assuming section 1341 requires actual repayment of disputed funds, the facts here establish that he qualifies for treatment under this section of the tax code. Specifically, taxpayer argues that the TROs and the writ of garnishment issued by the Texas court in 1982 operated as repayment or restoration sufficient to qualify for section 1341 treatment. We find no merit in taxpayer's argument. It is true that the TROs and the writ of garnishment changed the preexisting legal rights taxpayer had with respect to the disputed funds. When the TROs were issued, taxpayer temporarily lost his unfettered control over the funds.

And, when the writ of garnishment issued, the disputed funds were legally transferred out of taxpayer's hands and into the hands of the garnishees, the Texas banks. See supra Section II.A. Yet, neither the TROs nor the writ of garnishment operated to repay or restore funds. Webster's Dictionary defines "repay" as "to pay back (a person)" and defines "restore" as "to give back (. . .); make restitution of." WEBSTER'S NEW WORLD DICTIONARY 1137, 1145 (3d ed. 1988). Black's Law Dictionary in turn defines "restitution" to mean the "[a]ct or making good or giving an equivalent for or restoring something to the rightful owner." BLACK'S LAW DICTIONARY 1313 (6th ed. 1990). Taxpayer concedes LPP never received any funds by way of the TROs and the writ of garnishment. We therefore conclude taxpayer does not qualify for section 1341 treatment because he never repaid funds to LPP.

III.

We therefore affirm the district court's opinion in part and reverse and remand in part. Because we conclude this court lacks jurisdiction to consider taxpayer's claim for a refund for net operating losses carried back from 1982 to 1979, we remand to the district court to recalculate the appropriate tax refund due taxpayer for the year 1982.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.