# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3978

_____

| | | |
|---|---|---|
| Estate of Melvin W. Ballantyne, Deceased, Jean S. Ballantyne, Independent Executrix, Jean S. Ballantyne, | * * * * * * | |
| Appellants, | * * | Appeal from the United States Tax Court. |
| v. | * * | |
| Commissioner of Internal Revenue, | * * * | |
| Appellee. | * | |

_____

Submitted: May 16, 2003

Filed: August 7, 2003
_____

Before WOLLMAN, MAGILL, and BEAM, Circuit Judges.
_____

BEAM, Circuit Judge.

The Estate of Melvin Ballantyne and the executrix, Jean Ballantyne (collectively "the estate"), appeal a decision from the United States Tax Court. We affirm.

## I. BACKGROUND

In 1943, Melvin and his brother Russell formed an oral partnership called Ballantyne Brothers Partnership (BBP), which started out as a farming operation, but which grew into oil and gas exploration in the 1950's. When the oil and gas aspect of the partnership began to take off, Russell was in charge of the farming operation in North Dakota, while Melvin was in charge of the oil and gas exploration in the United States and Canada. In practice, and by mutual agreement, the brothers withdrew profits from the partnership that were attributable to each of their respective business pursuits and paid the expenses related to each of their respective activities. Generally speaking then, Melvin kept the oil and gas income and paid those expenses, while Russell did the same with the farm income and expenses. However, for tax purposes, Melvin and Russell each reported fifty percent of BBP's total income, gains, losses, deductions, and credits on their individual federal tax returns. For example, the farming operation kept only the income that it generated; however, by virtue of the arrangement to pay one-half of BBP's taxes each year, in years where the oil business was more profitable, the farming business, in effect, paid some of the oil business's taxes–and vice versa for years when the oil business was less profitable. Many of the assets used by BBP were not held in the partnership's name, but were owned by the brothers jointly or individually. To further complicate matters, BBP did not maintain a balance sheet, ledger, sale or purchase journals, or individual capital accounts for the partners.

For taxable years 1980 through 1994 (which encompasses the records which were before the Tax Court), BBP filed Form 1065[1] tax returns, and the returns for these years reflected that the brothers each held a fifty-percent interest in the partnership profits. For the taxable year 1994, BBP's gross income from farming totaled $1,503,976.58, which was attributable to grain sales by BBP. The proper

_____

[1]Form 1065 is the Partnership Return of Income form.

distribution of these 1994 grain sales are at the heart of the dispute in this case. On the Schedule F (Profit or Loss from Farming form) attached to the 1994 Form 1065, BBP reported depreciation and other farming expenses of $371,294, resulting in net farm income of $1,132,681. BBP reported additional income in 1994 of $144,046 from oil revenues, resulting in a total taxable income of $1,276,727.

After Melvin was diagnosed with cancer in late 1993, Melvin and Russell divided some of the partnership assets between the families. When Melvin died in March 1994 after a short battle with pancreatic cancer, the partnership automatically dissolved and family relations also took a turn for the worse. In April 1995, Jean, individually and in her capacity as executrix, filed suit against Russell and others. The dispute centered around the estate's view that Russell embezzled the income from the 1994 farming operations. It appears that this was the first that Melvin's family knew of the partnership arrangement to split the tax burden evenly, but split the profit according to each partner's respective business responsibilities. In fact, on its 1994 Form 1041, the estate reported a casualty/theft loss of $560,900. In other documents submitted to the IRS, the estate alleged that Russell embezzled its fifty-percent distribution from the 1994 farming income.

In August 1998, the parties settled the estate's lawsuit. As part of the settlement, Russell agreed to transfer $2 million to the estate, and to divide the interests in oil properties, bank and stock accounts equally between himself and the estate. The estate dropped its embezzlement claim against Russell, and the parties stipulated that all grain, and the proceeds therefrom, held by BBP on or after November 1993, belonged to Russell. The parties also stipulated that all assets and liabilities of BBP held on or after March 4, 1994, would be the sole property of Russell.

On June 16, 1999, the Commissioner issued a notice of deficiency to the estate for tax years 1994 and 1995.[2]  In addition to other adjustments, the Commissioner disallowed the estate's claimed theft loss of $560,900 in 1994.  The estate countered in its petition that the IRS erred in increasing its income by $560,900 because that amount was Russell's income and not taxable to the estate.  Prior to trial all issues were settled between the parties except the issue of how to allocate the 1994 grain sales.

Tax Court Proceedings

Following trial, the Tax Court ruled in favor of the Commissioner.  In its memorandum, the Tax Court found that the grain sold in 1994 was BBP's property and that the income from the grain sales was BBP's; thus, Russell and the estate were each allocated gain from these sales.  The court noted that it was not until the estate settled its lawsuit against Russell that the 1994 grain became the sole property of Russell, and taxpayers may not retroactively allocate between themselves tax obligations owed to the United States, citing United States v. Little, 753 F.2d 1420, 1430 (9th Cir. 1984).

The Tax Court further determined that the profits from the 1994 grain sales should be equally allocated between Russell and the estate.  In order to decide how much of the grain profit each partner should be allocated, the court determined each partner's distributive share.  The court noted that a partner must take into account his "distributive share" for each item of partnership income when determining his income tax, Vecchio v. Commissioner, 103 T.C. 170, 185 (1994), and each partner is taxed

_____

[2]Approximately one month later, the Commissioner also issued Russell a deficiency notice to avoid a potential "whipsaw."  The trial before the Tax Court was a joint trial with the estate, Jean Ballentyne, and Russell and his wife as petitioners.  Because Russell is not an appellant in this matter, we will refer to his alleged tax deficiencies only where necessary to our discussion of the estate's issues.

-4-

on his distributive share, regardless of whether the amount was actually distributed to them. United States v. Basye, 410 U.S. 441, 454 n.15 (1973). The distributive share is generally determined by the partnership agreement. 26 U.S.C. § 704(a). However, even if the distributive shares are set by the partnership agreement, if those allocations do not have substantial economic effect,[3] they will be disregarded. Because BBP was an oral partnership, the Tax Court had looked at all the facts and circumstances surrounding the formation and operation of the partnership to determine whether the oral agreement set the brothers' respective distributive shares.

At trial, the estate argued that each partner's distributive share should be determined by the underlying agreement between Melvin and Russell that each would be separately accountable for their own operations. In other words, the estate felt that Melvin should receive both the benefits (income), and the burdens (tax liability) of the oil and gas operations, while Russell should receive the same treatment with regard to the farming operations. Under this theory, Russell alone would have been liable for the tax liability on the gain from the 1994 grain sales.

Although it is not completely clear from the Tax Court's order, the court found either that the oral partnership agreement did not provide a basis for determining each partner's distributive shares, or that even if it did, the allocation provided for did not

---

[3]"Substantial economic effect" in this context is a term of art, and is meant to preclude partnerships from using agreements for gain allocation in order to evade taxes. Vecchio, 103 T.C. at 188. In order to determine whether an allocation has substantial economic effect, the court must determine whether the partner to whom the item is allocated bears the economic burdens and benefits of that allocated item. Allison v. United States, 701 F.2d 933, 938-39 (Fed. Cir. 1983). The test of whether an allocation has "substantial economic effect has been called a capital account analysis." Ogden v. Commissioner, 788 F.2d 252, 261 (5th Cir. 1986) (internal quotations omitted). Under the capital account analysis, the partners must maintain capital accounts, and upon liquidation, distributions must be made according to the positive or negative balances in those capital accounts. Id.

have substantial economic effect because no capital accounts were maintained by the partners or the partnership. See Ogden v. Commissioner, 788 F.2d 252, 261 (5th Cir. 1986) (setting forth the necessity of capital accounts in order for the distributive share allocation to have substantial economic effect). Thus, in order to adjudge who and how much should be taxed for the 1994 grain sales, the Tax Court had to decide that Melvin's and Russell's respective distributive shares would be calculated according to each partner's interest in the partnership. 26 U.S.C. § 704(b) (partner's distributive share to be determined in accordance with partner's interest in the partnership if agreement does not provide for this, or if the allocation in the agreement does not have substantial economic effect).[4]

The Tax Court found that, based on the lack of written documentation, the record was insufficient to determine the partners' relative capital contributions to the partnership. Similarly, the Tax Court found that the record was also insufficient to establish the partners' economic interests in the profits and losses of the partnership because the profits earned by the farming and the oil activities varied from year to year. Melvin ran the oil operations, while Russell was in charge of farming, and they each agreed to take yearly profits only from the income produced by the operations they managed. Their profits were not fixed–some years Melvin earned more, and some years Russell earned more. With regard to the third factor considered by the Tax Court in its distributive share analysis, the court noted that BBP's records, or lack thereof, made it difficult to determine the distributions made to the partners over the

---

[4]While each partner's interest in a partnership is presumed to be equal, this presumption can be overcome by taking into account all the relevant facts and circumstances. 26 C.F.R. § 1.704-1(b)(3)(i). Under the applicable treasury regulations, the factors to be considered in making such a determination include: (1) the partners' relative capital contributions; (2) the interests of the partners in economic profits and losses; (3) the partners' interest in cash flow and other non-liquidating distributions; and (4) the rights of the partners to distributions of capital upon liquidation. Id. § 1.704-1(b)(3)(ii).

years. However, the court noted that each partner generally withdrew funds from the respective activity he conducted, and the tax returns from 1980 through 1994 showed that overall, the oil and gas activity was more profitable than the farming activity. The court also noted that in the months before Melvin's death, some of BBP's assets were distributed equally between the two families. Finally, in reviewing the partners' rights upon liquidation, the court noted that the evidence indicated that each partner had equal rights to distributions of capital upon liquidation of BBP, as evidenced by the testimony of several parties at trial, including Jean and the children of both Russell and Melvin, and by the conduct of the estate in attempting to negotiate a fifty-fifty split of BBP's assets in the 1998 settlement agreement.

In addition to its application of the treasury regulation factors, the Tax Court found that additional evidence demonstrated that the partners had equal interests in BBP. BBP reported all partnership items equally between 1980 and 1994, and until Melvin's death, there was never a dispute concerning partnership allocations. The trial testimony indicated that all witnesses believed the brothers shared equally in partnership matters, and the estate's original and amended Forms 1041 for 1994 and 1995 reflect the estate's belief that it inherited a fifty-percent interest in BBP. Moreover, the brothers agreed to report all items of BBP equally for federal income tax purposes. Therefore, based on all the facts and circumstances relating to the economic arrangement of Melvin and Russell, the court concluded that each partner had a fifty-percent interest in BBP and that the gain from the grain sales should be equally allocated between Russell and the estate.

The Tax Court further rejected the estate's argument at trial that it should not have to report half of the 1994 grain sales as income because Russell received it "under a claim of right."[5] This relates back to the estate's contention on its 1994

---

[5]This doctrine refers to an instance where the taxpayer receives income under a "claim of right" and without restriction as to the taxpayer's right to dispose of the

return that Russell had embezzled the income from the 1994 grain sales. The Tax Court found that, assuming the claim of right doctrine applied in this situation, its finding that the gain from the 1994 grain sales was a partnership asset precluded a finding that Russell received the grain under such circumstances.

The estate appeals the Tax Court decision, and advances the same arguments on appeal to this court as it did to the Tax Court.

## II.    DISCUSSION

Tax Court findings of fact are subject to review for clear error, Commissioner v. Duberstein, 363 U.S. 278, 290-91 (1960), and conclusions of law are reviewed de novo,  Estate of Schuler v. Commissioner, 282 F.3d 575, 578 (8th Cir. 2002).  The Tax Court's determinations that the 1994 grain was a partnership asset, that Melvin and Russell each owned a fifty-percent interest in BBP, and that each had equal distributive shares of partnership gain are findings of fact subject to the clearly erroneous standard of review.[6]

income.  "In general, the claim of right doctrine requires a taxpayer to report as income money that he controls, yet to which competing claims may be made." Chernin v. United States, 149 F.3d 805, 814 (8th Cir. 1998).

[6]The estate argues that the issues before this court present mixed questions of law and fact, and are therefore subject to a de novo review.  The estate does not delineate which aspect of the Tax Court's decision is a question of law, however.  In this appeal we review: (1) whether the gain from the 1994 grain sales was a partnership asset; and (2) whether the brothers' held equal interests in the partnership. Both of these questions involved fact-intensive issues before the Tax Court which we review under the clearly erroneous standard.  To the extent that the estate's "claim of right" argument is an issue of law, we review that issue de novo.

1994 Grain Sales

The Tax Court was correct in its initial finding that the grain sold in 1994 was an asset of BBP. BBP reported the grain sales proceeds as income to the partnership on its 1994 tax return, and the estate and Russell each reported one-half of the income on their respective 1994 income tax returns. Although the estate claimed a theft loss of $560,900 on its 1994 return, the estate nonetheless reported its share of the grain income, acknowledging that it had acquired a fifty-percent interest in BBP upon Melvin's death and alleging that it was entitled to half of the distribution from the farm operations. Thus, BBP, the estate, and Russell all agreed in 1994 that the grain sold that year was a partnership asset. The Tax Court correctly found that the parties could not retroactively change the status of the 1994 grain in the 1998 settlement agreement. See Little, 753 F.2d at 1430. Moreover, the settlement agreement only reflects the way in which Russell and the estate agreed to divide the estate in 1998, not who owned the grain in 1994. The settlement agreement does not alter the fact that the 1994 grain sales were an asset of BBP.

Allocation of Gain from Grain Sales

Once the Tax Court found that the gain from the 1994 grain sales was an asset of BBP, it had to determine how to allocate that gain to the individual partners, as partnerships do not pay income tax. See 26 U.S.C. § 701. To do this, the Tax Court had to ascertain Melvin's and Russell's distributive shares in the partnership. While there is evidence that Russell was to be in charge of the farming operations and Melvin the oil and gas, the evidence suggests that the brothers intended the partnership to be equal. Thus, it is not clear from the agreement what each partner's distributive shares were to be. And, even if we were to accept the argument that the oral partnership agreement set Russell's distributive share as the farming profits and Melvin's as the oil and gas profits, we agree with the Tax Court that such an arrangement does not have substantial economic effect. An allocation of distributive

shares has substantial economic effect only if (1) capital accounts are kept in accordance with applicable treasury regulations; (2) liquidating distributions are made in accordance with the positive capital account balances; and (3) a partner is required to restore deficits in capital accounts following liquidation of the partnership. Vecchio, 103 T.C. at 189.

Applying 26 U.S.C. § 704(b), because there is no clear answer as to the value of each partner's distributive share, each partner will be assessed gain according to his interest in the partnership as determined from all the facts and circumstances. The Tax Court correctly used the applicable treasury regulations to aid in this determination. See 26 C.F.R. § 1.704-1(b)(3)(ii). We agree with the Tax Court that the first two factors–capital contributions and interests in profits and losses–are not necessarily determinative in this case. The estate argues that the second factor is determinative, because it was clear that the brothers had agreed that Russell would get farming profits and Melvin the oil profits. However, it is equally clear that the brothers had evenly split some of the burdens, i.e., the tax consequences of the combined profits and losses. Thus, while this second factor has some bearing on the final conclusion, we disagree with the contention that this factor is conclusive of the determination.

The third factor–the partners' interest in cash flow and other non-liquidating distributions–does support the Tax Court's conclusion. Melvin and Russell each withdrew various amounts from the partnership each year for their own income and to cover expenses for their respective operations. However, to some extent, they shared in each others profits as well. Russell testified that he had often assisted Melvin with income from the farm operations, and that Russell's wife had received some of the oil and gas income. The record reflects that Jean directly received $73,181.24 of the 1994 grain proceeds. This evidence suggests that the delineation between the two enterprises was not as clear cut as the estate suggests.

-10-

Finally, analysis of the fourth regulatory factor–the right of the partners to capital distributions upon liquidation–supports the Tax Court's conclusion as well. The witnesses at trial, including Jean, Melvin's three sons, and the accountant for BBP, all testified at trial that prior to Melvin's death, they had understood that Melvin and Russell each owned fifty percent of BBP. When negotiating the 1998 settlement agreement with Russell, the estate's goal was to receive fifty percent in value of the partnership's assets.

We understand the estate's argument and its frustration with this case. The unfortunate reality is that one brother got the 1994 grain income without paying all of the tax, while the other brother paid the tax without getting *any* of the income. This seems unfair, even by IRS standards. However, this result also seems to be supported by the partnership agreement, and, as the Tax Court noted, by what had happened in several other years (to the benefit of both brothers at different times), at least for taxable years 1980 through 1994. The fact that the brothers clearly had this farming/oil agreement is, of course, taken into account in the distributive share determination, but so is the fact that the brothers paid their taxes for fifty years as though BBP was an equal partnership. We also take into account that others in the family thought it was a completely equal partnership and were stunned, at Melvin's death, to find that taxes were split while profits were not.

The brothers decided a long time ago that, for whatever reason, it would be easier for each partner to keep track of, and, for the most part, benefit from the income from their respective operations. For tax purposes, however, they also made a conscious decision to split income and liabilities down the middle. It was certainly not an outlandish arrangement–they likely figured (and the record bears this out), that farming would be more profitable some years, and oil and gas would be more profitable others, but by and large, things would even out. This is consistent with a finding of equal partnership.

Under the nebulous facts of this arrangement–a fifty-plus year partnership with no written agreement, no ledger sheets, and no capital accounts–the Tax Court determined to the best of its ability each partner's interest in the partnership. In light of the presumption in favor of equal partnership, we cannot say that the Tax Court clearly erred in doing so.

Claim of Right Doctrine

Finally, we also agree with the Tax Court that the claim of right doctrine is inapposite. The record reflects that the grain sales and the proceeds therefrom were partnership property. As the Tax Court noted, each brother could withdraw profits from the other's respective activity, and he was not entitled to dispose of the income without restriction. Moreover, in its lawsuit against Russell, the estate sought to recover one half of the farm income to which it claimed it was entitled, yet ultimately dropped the embezzlement lawsuit. The claim of right doctrine does not apply under these circumstances.

III. CONCLUSION

For the foregoing reasons, we affirm the decision of the Tax Court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-