114 T.C. No. 35

UNITED STATES TAX COURT

MIDAMERICAN ENERGY COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 22728-97, 22729-97,     Filed June 30, 2000.
         22730-97, 22731-97.

        P is a public utility engaged in the retail
distribution of natural gas, electricity, and related
services.  In 1987, in response to the enactment of
sec. 451(f), I.R.C., P modified its method of
accounting for tax purposes to coincide with its
financial and regulatory accounting method and made a
sec. 481 adjustment.

        Federal income tax rates were reduced in 1986
pursuant to the Tax Reform Act of 1986, Pub. L. 99-514,
sec. 821, 100 Stat. 2372, creating an excess in
deferred Federal income tax.  P was required to adjust
utility rates from 1987 through 1990 to compensate for
this overcollection.

        <u>Held</u>:  P's method of accounting for utility
services from the unbilled period violates sec. 451(f)
and must be disallowed.  <u>Held</u>, <u>further</u>, P must adjust
the sec. 481 adjustment it made in 1986 to include
revenue attributable to gas costs from the unbilled

period as of Dec. 31, 1986.  Held, further, P's rate reductions from 1987 through 1990 to compensate for excess deferred Federal income tax are not deductible business expenses within the meaning of sec. 1341, and, therefore, P is not entitled to the beneficial treatment of sec. 1341.

David E. Jacobson and Richard P. Swanson, for petitioner.

Robert M. Morrison and J. Anthony Hoefer, for respondent.

COHEN, Judge:  Respondent determined the following deficiencies in the Federal income tax of MidAmerican Energy Company (petitioner):

| Tax Year Ended | Deficiency |
| --- | --- |
| Dec. 31, 1984 | $   698,682 |
| Dec. 31, 1987 | 171,396 |
| Dec. 31, 1988 | 994,913 |
| Dec. 31, 1989 | 1,457,191 |
| Dec. 31, 1989 | 715,208 |
| Nov.  7, 1990 | 391,914 |
| Dec. 31, 1990 | 5,121,384 |

On November 7, 1990, a merger took place, resulting in a short tax year.

After concessions by the parties, the issues for decision in these consolidated cases are whether petitioner's accrual of income from furnishing utility services was in accordance with section 451(f) and whether the amount reported by petitioner pursuant to section 481 for 1986 adequately reflects the change in accounting method under section 451(f) (the unbilled revenue issues), and whether petitioner is entitled to relief under

section 1341 for its reduction in utility rates from 1987 through 1990 to compensate for excess deferred Federal income tax.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference.

Petitioner, a public utility, is a subsidiary of MidAmerican Energy Holding Company and is the successor in interest to Midwest Resources, Inc. (Midwest Resources), a corporation formed under the laws of Iowa. At the time the petitions in these cases were filed, petitioner's principal place of business was in Des Moines, Iowa. Predecessors in interest of Midwest Resources whose Federal income tax returns are in issue in these cases include Iowa Resources, Inc., and Midwest Energy Company. Any reference to petitioner herein includes its predecessors.

Petitioner engages in the retail distribution of natural gas (gas), electricity, and related services to residential, commercial, and industrial customers in Minnesota, Iowa, Nebraska, and South Dakota. In the ordinary course of business, petitioner purchases gas and either resells it to its customers or consumes it to generate electricity for its customers. During

the years in issue, petitioner was an accrual method taxpayer reporting, except for 1990, on a calendar year basis.

Petitioner's operations are subject to the rules and regulations of Federal and State agencies, including the Federal Energy Regulatory Commission (FERC), the Iowa Utilities Board (IUB), the Minnesota Public Utility Commission, the South Dakota Public Utility Commission, and certain municipal governments in Nebraska (regulatory agencies). Under established procedures, these regulatory agencies prescribe the rates at which petitioner may sell gas and electricity (approved tariff rates), the accounting methods and practices that petitioner may adopt for regulatory and financial accounting purposes, the billing practices, the payment practices, and other terms and conditions for the sale of gas and electricity to its customers. The approved tariff rates for gas are generally made up of gas costs and the nongas margin. The nongas margin represents the recovery of all costs other than gas costs, including physical plant costs, meter-reading expenses, and labor and other nongas related expenses, as well as overhead and a reasonable rate of return. The approved tariff rates for electricity include several components in addition to costs incurred to supply energy.

Purchased Gas Adjustment

Petitioner implements approved tariff rates for gas using the purchased gas adjustment (PGA) mechanism. Once rate

schedules and procedures are approved by the regulatory agencies, the PGA mechanism allows petitioner to recognize fluctuations in gas costs quickly and to incorporate those changes in its customers' bills without formal rate-setting procedures. Accordingly, petitioner can recover its gas costs on a timely basis throughout the year.

The period that the PGA mechanism covers runs from September 1 of the first year to August 31 of the following year (the PGA year). As part of the PGA mechanism, certain disclosures are required throughout the year, including an annual PGA filing, monthly PGA filings, and an annual PGA reconciliation filing. The annual PGA filing is made prior to August 1 of each year and estimates anticipated sales and expenses for the upcoming PGA year. In the annual PGA filing, projected gas costs are established and incorporated into the approved tariff rates. This projection is based on gas actually used and actually billed during the previous year with adjustments for weather normalization.

Periodic PGA filings are made throughout the calendar year at the end of each calendar month to adjust the billing rate to reflect near-concurrent gas costs, as the price of gas fluctuates. Accordingly, each month, rates that are set forth in the annual PGA filing are increased or decreased without normal rate-setting procedures by a pricing adjustment factor (PGA

factor).  The PGA factor is calculated based upon the weighted average per unit price of gas for the upcoming month, using sales volume that was established in the annual PGA filing.  Each month, the PGA factor, together with the approved tariff rate, is applied to the gas usage to determine how much is billed to each customer.

The final filing requirement of the PGA mechanism is the PGA reconciliation filing.  This filing is made by October 1 and compares estimated gas costs with actual gas revenues that are billed through the PGA mechanism during the year, net of the prior year's PGA reconciliation.  Negative differences in the reconciliation are underbillings, and positive differences are overbillings.  Petitioner internally tracks over and/or underbillings for each month of the PGA year.  The cumulative annual over or undercollection is recorded in the annual PGA reconciliation.  Underbillings are recouped through 10-month adjustments to the PGA factor from which the underbilling was generated.  Overbillings are returned to the customer class from which they were generated either by bill credit, check, or 10-month adjustments to the PGA factor from which the overbillings were generated.  If, however, the overcollection exceeds 5 percent of the annual cost of gas subject to recovery for a specific PGA grouping, the amount overbilled is refunded by bill credit or check.  If a discrepancy between estimated nongas

margin and actual nongas costs exists, petitioner is not entitled to use the PGA mechanism, as described above, to adjust its anticipated nongas margin revenues.

Energy Adjustment Clause

Petitioner adjusts approved tariff rates for electricity using the energy adjustment clause (EAC), a mechanism similar to the PGA mechanism. Approved tariff rates for electricity are set at the beginning of each year, and the EAC mechanism allows petitioner to adjust periodically the approved tariff rates for electricity to recover increases in the costs of supplying energy, including fluctuations in gas costs that are used to generate electricity. The cost adjustments are determined on a monthly basis and are applied to meter readings made during the month. Yearly and monthly filings are required as part of the EAC mechanism, but reconciliations are incorporated on a monthly basis, alleviating the need for a yearly reconciliation.

Petitioner's Accounting Method

In order to balance its workload each month, petitioner reads meters and bills customers for gas and electricity based on 21 billing cycles. Accordingly, petitioner reads its customers' meters every month on 21 different schedules and, on that basis, submits bills for the price of gas actually consumed by each customer from the last meter reading to the current meter

reading. The amount of utility service that is provided from meter reading to meter reading is the revenue month usage.

Prior to 1982, petitioner reported income for financial, regulatory, and tax accounting purposes on the cycle meter-reading method. Under this method, if the meter-reading date fell within the current taxable year, the income attributable to utility services provided on or before the reading date was included in gross income in that taxable year. Any utility service provided to customers within the current taxable year but after the last meter-reading date of such year was not recognized as income until the following taxable year.

In 1982, petitioner changed its method of accounting for financial and regulatory accounting purposes from the cycle meter-reading method to the accrual method of accounting. Under the accrual method of accounting, the sales price of gas and electricity consumed after each customer's last meter-reading date to December 31 (unbilled period) was recorded as unbilled revenue. Unbilled revenue consists of two components: (1) Nongas margin and (2) gas costs of utility services provided to customers during the unbilled period (unbilled gas costs). However, on December 31, an adjustment was made to reduce unbilled revenue by the amount of unbilled gas costs. For tax purposes, petitioner continued to report taxable income on the cycle meter-reading method, making adjustments on Schedule M-1 on

its Federal income tax returns to reflect the difference between tax and financial accounting for unbilled revenue.

In 1987, petitioner changed its method of accounting for Federal income tax purposes and began including unbilled revenue in taxable income.  Consistent with its financial and regulatory accounting method, petitioner reduced unbilled revenue by the amount of unbilled gas costs, leaving only the nongas margin as part of taxable income.  As part of its change in method of accounting, petitioner  made a section 481 adjustment to include in income the amount of revenue attributable to the unbilled period as of December 31, 1986.  This adjustment was reduced by unbilled gas costs as of December 31, 1986.  In years thereafter, petitioner made Schedule M-1 adjustments to reflect the reduction in unbilled revenue by the unbilled gas costs amounts.

Deferred Tax Expense

Federal income tax is also a component of the approved tariff rates that petitioner charges its customers.  However, the Federal income tax that petitioner uses in determining approved tariff rates is generally different from actual Federal income tax currently owed to the Government.  This is attributable to timing differences of recognizing items of income and expense.  For example, straight-line depreciation is used for rate-making purposes, while accelerated depreciation is used to calculate current Federal income tax.  In earlier years, when accelerated

depreciation exceeds straight-line depreciation, the timing difference causes a utility to collect more than the utility currently owes to the Government. This excess of Federal income tax collected is referred to as the deferred Federal income tax expense and represents Federal income tax to be paid by petitioner in subsequent years when depreciation for rate-making purposes exceeds depreciation for Federal income tax purposes. The utility uses amounts it overcollected in earlier years to pay Federal income tax it owes in later years. Deferred tax expense is tracked using a deferred Federal income tax account. If Federal income tax rates remain constant, the deferred Federal income tax account will zero out over the useful life of the underlying assets.

In years prior to 1987, petitioner collected revenues based on a 46-percent Federal income tax rate and increased the deferred Federal income tax account by the amount that collections exceeded the current Federal income tax. The Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 821, 100 Stat. 2372, effective for 1987 and years thereafter, reduced corporate Federal income tax rates from 46 percent to 39.95 percent in 1987 and to 34 percent in 1988. As a result, petitioner's accumulated deferred Federal income tax as of December 31, 1986, exceeded the amount of Federal income tax that petitioner would be expected to pay in future years.

The regulatory agencies had the authority to require petitioner to adjust rates to reflect such an excess, but TRA section 203(e), 100 Stat. 2146, provided that the normalization provisions of sections 167 and 168 would be violated if a utility reduced its excess deferred Federal income tax reserve more rapidly than as provided under the average rate assumption method (ARAM).  This TRA provision generally applies to those excess deferred Federal income taxes attributable to timing differences relating to depreciation and property classifications described in sections 167(a)(1) and 168(e)(3) (protected excess deferred Federal income tax).  Under ARAM, the protected excess deferred Federal income tax can be reversed only through rate adjustments as the timing differences that created them reverse. Accordingly, the protected excess deferred Federal income tax is reduced ratably over the underlying asset's remaining useful life, consistent with normalization, by reducing future utility rates.

Consistent with these provisions, petitioner began reducing its protected excess deferred Federal income tax account in November 1987 by reducing utility rates.  This continued through 1990.  The rate reductions were allocated to each customer class based on each customer class's contribution to the excess deferred Federal income tax, but rate reductions were not specifically allocated to customers who paid pre-1987 utility

fees.  None of petitioner's customers who paid pre-1987 utility rates and subsequently left petitioner's service asserted claims against petitioner for repayment or refund of the excess deferred Federal income tax.  Petitioner was not required to nor did it issue refund checks or billing credits to its customers, and the regulatory agencies also did not require petitioner to pay interest on amounts returned through rate reductions.

Petitioner's 1987, 1988, 1989, and 1990 Federal income tax returns used the method of accruing unbilled revenue, as set forth above, in calculating taxable income.  Also for those years, petitioner claimed section 1341 relief for the amount in which it reduced utility rates to compensate for excess deferred Federal income tax.  Respondent audited petitioner's 1987, 1988, 1989, and 1990 Federal income tax returns.  Upon review, respondent rejected petitioner's method of accruing unbilled revenue (unbilled revenue issue) and denied petitioner's claims for relief under section 1341 for rate reductions associated with excess deferred tax (section 1341 issue).

OPINION

## Unbilled Revenue Issues

The unbilled revenue issue is essentially an accounting dispute.  Petitioner maintains that its regular method of accounting, which uses the PGA and EAC mechanisms to recover gas costs, already includes December gas costs in the taxable year

and that to accrue revenue from gas costs for the period following the December meter-reading date to December 31 (unbilled period) results in double counting.  Respondent contends that petitioner's method of accounting fails the requirements of section 451(f) and that petitioner must include in taxable income amounts attributable to utility services, gas costs and nongas margin, provided during the taxable year, including the unbilled period.

Section 446(a) generally provides that taxable income shall be computed under the method of accounting that the taxpayer regularly uses to compute income for financial accounting purposes.  If such method of accounting does not clearly reflect income, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income."  Sec. 446(b).

Prior to the passage of section 451(f) in the Tax Reform Act of 1986, Pub. L. 99-514 sec. 821, 100 Stat. 2372, petitioner recognized taxable income from utility services based on the taxable year in which its customers' utility meters were read (the cycle meter-reading method).  See Rev. Rul. 72-114, 1972-1 C.B. 124.  Under the cycle meter-reading method, utility services provided to customers during the unbilled period were not recognized as income until the following taxable year.  See id. Recognizing that the cycle meter-reading method allowed utilities

to defer yearend income, S. Rept. 99-313, 1986-3 C.B. (Vol. 3), 120-121, Congress passed section 451(f).

Section 451(f)(1) provides:

In the case of a taxpayer the taxable income of which is computed under an accrual method of accounting, any income attributable to the sale or furnishing of utility services to customers shall be included in gross income not later than the taxable year in which such services are provided to such customers.

This section effectively requires taxpayers to discontinue using the cycle meter-reading method of accounting and adopt a method of accounting that includes taxable income from utility service provided during the taxable year, including the unbilled period.

Effective for 1987 and years thereafter, petitioner changed its method of accounting for tax purposes and began accruing utility fees attributable to nongas margin from the unbilled period. Petitioner did not, however, make an accrual for utility fees attributable to gas costs from the unbilled period. Consistent with this change in method of accounting, petitioner made a section 481 adjustment, including in taxable income that portion of utility fees from the unbilled period attributable to the nongas margin, as of December 31, 1986.

Petitioner's method of accounting violates the literal requirements of section 451(f) because it does not accrue utility fees attributable to gas costs from the unbilled period. In practice, petitioner calculates taxable income using meter readings as a proxy for actual utility services provided during

the calendar year and makes an accrual for nongas margin from the unbilled period.  According to section 451(f), a utility must include in taxable income the revenue attributable to utility services provided during the taxable year.  See S. Rept. 99-313, supra, 1986-3 C.B. (Vol. 3) at 120-121.  Utility services are "provided" when such services are made available to, and used by, the customer.  Id.  "The taxable year in which services are treated as provided to customers shall not, in any manner, be determined by reference to (i) the period in which the customers' meters are read, or (ii) the period in which the taxpayer bills (or may bill) the customers for such service."  Sec. 451(f)(2)(B).  On average, petitioner's method of accounting includes in taxable income utility services provided from December 15 of the prior year to December 15 of the current year. With respect to the unbilled period, we see no difference in petitioner's treatment of revenue from gas costs under its current method of accounting and the cycle meter-reading method of accounting that section 451(f) was intended to eliminate. While it is true that a full year's worth of income from utility service is included in determining taxable income, the included year is not the same as the year intended by section 451(f). Congress there specified that the income attributable to utility services must be reported for the same year in which the services were provided.

Petitioner contends that its agency-imposed accounting method, which uses the PGA and EAC mechanisms to recover current gas costs, allows petitioner to recover December gas costs and alleviates the need to accrue gas costs from the unbilled period. We disagree. Section 451(f) focuses on the inclusion of income from utility services actually provided during the taxable year, and the PGA and EAC mechanisms address only the pricing of utility services billed. Irrespective of its pricing mechanisms, petitioner is still using meter readings as a proxy for utility services actually provided during the taxable year in direct contravention of section 451(f). It is also well settled that consistency with agency-imposed accounting practices is not determinative of the adequacy of petitioner's accounting method for tax purposes. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 542-543 (1979) (there are "vastly different objectives that financial and tax accounting have", and "any presumptive equivalency between tax and financial accounting would be unacceptable."), affg. 563 F.2d 861 (7th Cir. 1977), affg. 64 T.C. 154 (1975). Accordingly, we conclude that petitioner's accounting method violates the requirements of section 451(f).

To reflect properly the requirements of section 451(f) and prevent double counting, petitioner's section 481 adjustment in 1986 should have also included the unbilled revenue attributable to gas costs from the unbilled period as of December 31, 1986.

In years thereafter, an adjustment should have been made to January bills removing revenues from the unbilled period of the prior taxable year, and a corresponding adjustment should have been made to include revenue from the unbilled period for the current year for both gas costs and nongas margin. The relevant legislative history suggests:

> where it is not practical for the utility to determine the actual amount of services provided through the end of the current year, this estimate may be made by assigning a pro rata portion of the revenues determined as of the first meter reading date or billing date of the following taxable year. [See S. Rept. 99-313, <u>supra</u>, 1986-3 C.B.(Vol. 3) at 121.]

Respondent has made the necessary adjustment in the statutory notice, and respondent's determination of this issue is sustained.

<u>Section 1341 Issue</u>

Petitioner also argues that it is entitled to section 1341 treatment for the amount by which it reduced utility rates from 1987 to 1990 to compensate for excess deferred Federal income taxes. Section 1341(a) provides in pertinent part:

> SEC. 1341(a). In General.--If--
>
> (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;
>
> (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction; or

(5) an amount equal to--

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter * * * for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

Section 1341 was enacted by Congress to mitigate the sometimes harsh results of the application of the claim of right doctrine.  See United States v. Skelly Oil Co., 394 U.S. 678, 681 (1969).  Under that doctrine, a taxpayer must recognize income for an item in the year it is received under a claim of right even if it is later determined that the right of the taxpayer to the item was not absolute and it is returned in a subsequent year.  See North Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932).  Although the taxpayer is allowed to take a deduction in the year of return for the amount of the item, the deduction would fail to make the taxpayer whole if the applicable tax rate was higher in the year of recognition than it was in the year of return.  See United States v. Skelly Oil Co., supra.  Section

1341 makes the taxpayer whole by reducing taxable income in the year of return by the amount of the allowable deduction or by giving a credit in the year of return for the hypothetical decrease in tax that would have occurred in the year of recognition had the item been excluded from income in that year. The taxpayer may use whichever method is most beneficial. See sec. 1.1341-1(i), Income Tax Regs.

Prior to 1987, the payments that petitioner received from its customers for utility services included a deferred Federal income tax component attributable to accelerated depreciation. Petitioner paid Federal income tax on those amounts at a rate of 46 percent. Federal income tax rates were reduced in 1986 to 39.95 percent for 1987 and to 34 percent for 1988 and years thereafter, creating an excess in petitioner's deferred Federal income tax account. Petitioner corrected this excess by reducing utility rates that were charged to its customers from 1987 through 1990. However, due to the reduction in rates, petitioner paid a greater amount of tax in years prior to 1987 than the tax benefit it received from 1987 to 1990 when it reduced its utility rates. Accordingly, on its Federal income tax returns for 1987 through 1990, petitioner claimed section 1341 relief.

The first requirement of section 1341(a)(1) is that the item in question be included in taxable income by the taxpayer because it appeared that the taxpayer had an unrestricted right to the

item.  Respondent argues that petitioner fails to meet this requirement because it had an actual, and not an apparent, unrestricted right to income from utility fees that it collected prior to 1987.  See, e.g., Kraft v. United States, 991 F.2d 292, 299 (6th Cir. 1993); Bailey v. Commissioner, 756 F.2d 44, 47 (6th Cir. 1985); Van Cleave v. United States, 718 F.2d 193, 196-197 (6th Cir. 1983); Prince v. United States, 610 F.2d 350, 352 (5th Cir. 1980).  Petitioner asks us to adopt the substantial nexus test recently adopted in two separate Federal District Court opinions on fact patterns nearly identical to the one at hand.  See Dominion Resources, Inc. v. United States, 48 F. Supp.2d 527 (E.D. Va. 1999); WICOR, Inc. v. United States, 84 AFTR2d 99-6905, 99-2 USTC par. 50,951 (E.D. Wis. 1999).  We do not resolve this dispute over the proper test, however, because of our conclusion that petitioner does not satisfy another requirement for relief under section 1341.

The second requirement that petitioner must satisfy, in order to qualify for relief under section 1341, is that a deduction must be allowable in the year of return for the refunds that were made.  Respondent argues that petitioner fails to meet this requirement because petitioner's rate reductions from 1987 to 1990 do not qualify as deductible expenses within the meaning of section 1341(a)(2).  Petitioner maintains that the right to claim a deduction under section 162 for funds or property

returned after a taxpayer has previously included such funds or property in income rests in the claim of right doctrine itself. United States v. Skelly Oil Co., supra at 680-681; North Am. Oil Consol. v. Burnet, supra at 424(stating that, if the taxpayer were obliged to refund amounts previously included under the claim of right doctrine, it would be entitled to a deduction when the amount was returned).

This issue was recently addressed in both Dominion Resources, Inc. v. United States, supra, and WICOR, Inc. v. United States, supra, with the courts reaching different conclusions. The court in Dominion Resources held that the return of excess deferred Federal income tax is a deductible expense, whereas, in WICOR, Inc., the court distinguished Dominion Resources and decided that a mere reduction of future utility rates did not constitute a deductible business expense. See also Florida Progress Corp. & Subs. v. Commissioner, 114 T.C. ___ (2000) (also filed this date).

The use of the word "deduction" in section 1341(a)(2) limits section 1341 applicability to refunds or returns that would otherwise be deductible under another section of the Internal Revenue Code. United States v. Skelly Oil Co., supra at 683. Therefore, the decision on this issue depends upon whether the return of excess deferred Federal income tax by petitioner is an

- 22 -

ordinary and necessary business expense deductible under section 162.

Respondent argues that there is a difference between a mere rate reduction on future sales to take into account overrecoveries in a previous year and an expense for which a deduction is allowable.  See, e.g., Roanoke Gas Co. v. United States, 977 F.2d 131 (4th Cir. 1992); Iowa S. Utils. Corp. v. United States, 841 F.2d 1108 (Fed. Cir. 1988); Southwestern Energy Co. v. Commissioner, 100 T.C. 500 (1993).

In Iowa S. Utils. Corp., a taxpayer utility collected a surcharge from its customers in order to help finance the construction of a new power plant.  The regulatory agency approved the surcharge on the condition that the surcharge would be refunded by the taxpayer without interest to customers over the next 30 years.  The taxpayer argued that the obligation to refund was a liability satisfying the all events test of section 461 and that it was entitled to a current deduction for the full amount of the refunds it expected to make during the next 30 years.  Iowa S. Utils. Corp. concerned tax years prior to the date when the economic performance rules of section 461(h) went into effect.  The Court of Appeals held that the taxpayer did not have a deductible liability to refund, but, instead, the refunds resulted from a regulatory policy setting the allowable rates for

future electric services. See id. at 1113.  In reaching its conclusion, the court stated:

> In reality, Iowa Southern must be viewed simply as enjoying higher rates, and greater income, during the construction period, and lower rates, and presumably less income, during the thirty years that follow completion of the plant.  As a result, it is also incorrect to view the change in the rate structure as a cost of goods sold.  * * *  [Id. at 1114.]

One of the factors considered by the court was that future refunds were to be made to future customers, some of whom were not in privity with the customers who paid the original surcharge during plant construction.  See Chernin v. United States, 149 F.3d 805, 816 (8th Cir. 1998).

In Roanoke Gas Co., the taxpayer collected utility fees that were based on the costs that it incurred for purchasing gas.  Due to the lag between the effective date of a price change for gas and implementation of a rate adjustment to reflect this change, the taxpayer overcollected from its customers when gas prices dropped.  The taxpayer was required at the end of each year to determine the amount, if any, that it had overcollected and to adjust rates accordingly for the next year.  The taxpayer claimed that the obligation to refund excessive collections through a rate adjustment constituted a deductible business expense.  The years in issue predated the section 461(h) economic performance rules.

In holding that the taxpayer was not entitled to a current deduction for refunds not yet made, the court, relying on Iowa S. Utils. Corp., found that the taxpayer's obligation to refund was not a deductible liability but was merely an obligation to reduce its future income. See Roanoke Gas Co. v. United States, supra at 136-137. The Court of Appeals pointed to several factors that supported its determination. First, rather than an actual movement of funds from the taxpayer to its customers, a setoff on customers' bills was used as the medium for carrying out the refunds. Second, the identity of the customers who received the refunds was not identical to the customers who had overpaid funds in the earlier year of overcollection. Finally, no interest component was included with the refund for the time span between when the refunds were ordered by the regulatory agency and when the refunds were actually carried out on customers' bills. In the view of the court, these factors, when combined, made the refunds resemble a reduction in future income rather than a deductible expense.

The decision of this Court in Southwestern Energy was based on facts nearly identical to those of Roanoke Gas Co. This Court recognized that there is a difference between an expenditure, deductible under section 162, and a mere reduction in income under a regulatory requirement that a taxpayer utility compute its rates in a manner that offsets overrecoveries from a previous

year.  See Southwestern Energy Co. v. Commissioner, supra at 505.
In holding that the refund by the taxpayer was a reduction in
income and did not qualify as a deduction, this Court pointed to
several determining factors.  First, no interest component was
included with the refund on customers' bills.  Second, the
overrecoveries were not amounts that exceeded the rates approved
by the regulatory agencies and thus were collected as part of an
authorized rate scheme.  Third, the identity of the customers who
received the refunds was not identical to the customers who had
overpaid funds in the earlier year of overcollection.  Finally,
there was no current outlay of funds involved but, instead, a
setoff that reduced income that would otherwise have been
received in a later year.  These factors, when combined, made the
refunds more resemble a reduction in future income than a
deductible expense.

In these cases, a reduction in future rates occurred to take
into account overrecoveries in earlier tax years.  Petitioner
reduced utility rates based on each customer class' contribution
to excess deferred Federal income tax but did not match
reductions to customers who actually contributed to the excess.
Rather, petitioner returned the excess deferred Federal income
tax to customer classes based upon current energy consumption,
not upon amounts each individual customer actually overpaid
during the years of overrecovery; rate reductions also applied to

customers who were not customers of petitioner during the years of overcollection because they had only recently moved into petitioner's service area. There was also no interest component to the rate reductions, and no out-of-pocket payments in the form of checks or bill credits were made. In sum, petitioner was not repaying its customers the excess deferred Federal income tax that it collected in prior years. Rather, the rate reductions served only to reduce income in future years and did not directly compensate petitioner's customers for prior overcollection. Because we conclude that petitioner is not entitled to a deduction, petitioner fails to qualify for the preferential treatment of section 1341 for the taxable years in issue.

In Dominion Resources, Inc. v. United States, supra, refunds of the entire amount of unprotected excess deferred Federal income tax were made to customers within 60 days of the regulatory authority's order to refund excess deferred Federal income tax, whereas, in the cases at hand, the returns were spread out over 3 years. Also, the media used by the taxpayer in Dominion Resources to carry out such refunds were wire transfers to customers, checks to customers, or one-time credits on customers' bills. See id. at 532-533. Finally, at least some of the utility's customers received interest on a portion of their refund from the date when the income tax rates lowered until the date of refund. See id. at 533. These factors, which differ

from the facts of the cases at hand, combined to persuade the District Court in Dominion Resources that the refunds were more like deductible expenses than future rate reductions.

Our holding is also consistent with our prior opinion in Andrews v. Commissioner, T.C. Memo. 1992-668. In Andrews, a taxpayer, injured while on the job, received excess disability payments from Met Life, her insurance carrier, while she was involved in a legal action with the Social Security Administration to receive benefits. The payments were made subject to the condition that, if the taxpayer won her dispute and was awarded funds for past Social Security benefits, the taxpayer would refund the excess disability payments to the insurance company. The taxpayer won her legal action and satisfied her refund obligation by setting off her liability to Met Life against future ordinary disability payments to which she was entitled from Met Life. This Court denied section 1341 relief, stating that the taxpayer's return of funds by means of a setoff would not qualify as a deduction because:

> there has been no "restoration", i.e., nothing has been repaid to Met Life by Mrs. Andrews. We reject the contention that, under these facts, there can be a constructive restoration when no actual repayment is made.
>
> In 1987, Mrs. Andrews received all the Social Security payments to which she had been entitled for the years 1983 through 1986. At that point, Met Life had paid Mrs. Andrews more than it was obligated to pay, and reduced its payments to her in subsequent years until it had setoff its obligation to

Mrs. Andrews by the amount of Mrs. Andrews' obligation to Met Life. The payments which Mrs. Andrews received are properly taken into account in the years in which she received them. There was no constructive restoration to Met Life in 1987 or any subsequent year, as no out-of-pocket payment was made. [Id.; see also Chernin v. United States, 149 F.3d at 816.]

Petitioner argues that section 1.461-4(g)(3), Income Tax Regs., allows for a refund by means of a setoff to qualify as a section 162 deductible expense. That section reads in pertinent part:

> (3) Rebates and refunds. If the liability of a taxpayer is to pay a rebate, refund, or similar payment to another person (whether paid in property, money, or as a reduction in the price of goods or services to be provided in the future by the taxpayer), economic performance occurs as payment is made to the person to which the liability is owed. This paragraph (g)(3) applies to all rebates, refunds, and payments or transfers in the nature of a rebate or refund regardless of whether they are characterized as a deduction from gross income, an adjustment to gross receipts or total sales, or an adjustment or addition to cost of goods sold. In the case of a rebate or refund made as a reduction in the price of goods or services to be provided in the future by the taxpayer, "payment" is deemed to occur as the taxpayer would otherwise be required to recognize income resulting from a disposition at an unreduced price. * * * [Emphasis added.]

This regulation does not assist petitioner, because there is no liability of petitioner to repay its customers. Petitioner reduced rates in accordance with ARAM, but, as set forth above, it was unable to show that it was compensating its customers for prior overcollections. In addition, section 1.461-4(g)(3), Income Tax Regs., was not in effect for the years in issue. It

is effective only for years after December 31, 1991.  See sec.
1.461-4(k)(3), Income Tax Regs.

    To reflect the foregoing,

<u>Decisions will be entered
under Rule 155</u>.