114 T.C. No. 36

UNITED STATES TAX COURT

FLORIDA PROGRESS CORPORATION & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2961-97.                    Filed June 30, 2000.

U, a public utility filing consolidated Federal
income tax returns with P, engaged in the retail and
wholesale distribution of electricity and related
services.  Federal income tax rates were reduced in
1986 pursuant to the Tax Reform Act of 1986, Pub. L.
99-514, sec. 821, 100 Stat. 2372, creating an excess in
deferred Federal income tax collected from customers of
U.  U was required to adjust utility rates in 1987 and
1988 to compensate for this overcollection.

U was allowed to collect funds equal to its
projected fuel and energy conservation costs.  Pursuant
to regulatory law, monthly collections remained fixed
over a 6-month recovery period in order to decrease the
volatility of customers' bills.

1.  <u>Held</u>, U's rate reductions from 1987 through
1990 to compensate for excess deferred Federal income
tax are not deductible business expenses within the

meaning of sec. 1341, I.R.C., and, therefore, P is not entitled to the beneficial treatment of sec. 1341.

2. _Held_, _further_, overcollections for fuel and energy conservation costs are not income to P under sec. 61 because U acquired funds subject to an unconditional obligation to repay.

<u>David E. Jacobson</u> and <u>Richard P. Swanson</u>, for petitioner.

<u>James F. Kearney</u>, for respondent.

OPINION

COHEN, <u>Judge</u>:  Respondent determined deficiencies in petitioner's consolidated Federal income tax for 1986, 1987, and 1988 in the amounts of $1,356,802, $1,321,896, and $7,099,160, respectively.

After concessions by the parties, the issues for decision are:  (1) Whether one of petitioner's subsidiaries is entitled to compute its tax liability for 1987 and 1988 pursuant to section 1341 and (2) whether funds overcollected pursuant to fuel and energy conservation cost recovery rates constitute income under section 61.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Background

The parties submitted this case fully stipulated pursuant to Rule 122. The stipulated facts are incorporated by this reference.

Florida Progress Corporation (petitioner) is a corporation organized and existing under the laws of the State of Florida. At the time of the filing of the petition, petitioner's principal place of business was located in St. Petersburg, Florida.

Petitioner operates Florida Power Corporation (Florida Power), a public utility that provides electricity service to approximately 1.3 million retail customers over 20,000 square miles of central and northern Florida. Florida Power also provides wholesale electricity to other electricity providers. Petitioner and its subsidiaries, including Florida Power, filed consolidated Federal income tax returns, reported income on a calendar year, and used the accrual method of accounting during all of the years in issue.

Florida Power is subject to the rules and regulations of both the Florida Public Service Commission (FPSC) and the Federal Energy Regulatory Commission (FERC). The FPSC regulates the rates that Florida Power may charge its retail customers, whereas the FERC regulates the rates that Florida Power may charge its wholesale customers. Both the FPSC and the FERC allow Florida Power to charge its customers a rate for electricity calculated

from two components, the estimated costs of providing future services and an approved rate of return on its invested capital. The projected amount of Federal income tax that Florida Power will pay is a component of the estimated costs of providing future services.

Excess Deferred Federal Income Tax

The Federal income tax expense that Florida Power uses in determining its costs of providing future services for rate-making purposes is generally different from the Federal income tax expense that it currently owes to the Government. This difference is attributable to timing differences in recognition of items of income and expense. For example, the FPSC and the FERC allow Florida Power to use straight-line depreciation for rate-making purposes, while accelerated depreciation is used for determining current taxable income. In an earlier year when accelerated depreciation is greater than straight-line depreciation, this timing difference causes a utility to collect a higher Federal income tax component for rate-making purposes than the income taxes currently owed to the Government for that year. This excess of the estimated Federal income tax expense is referred to as "deferred Federal income tax expense". In a subsequent year when the timing differences reverse, the income tax component that the utility charges yields collections that are less than the Federal income taxes owed by the utility. The

utility uses the amounts that it overcollects in earlier years to pay the taxes owed in later years.

Both the FPSC and the FERC require the establishment and maintenance of deferred income tax accounts that represent the net cumulative amount of Federal income tax expected to be paid in future years.  If the income tax rate remains constant, the deferred income tax account will zero out once the timing differences between rate-making income and taxable income expire.

Customers of Florida Power receive the economic benefit of all deferred income taxes for as long as they are held by Florida Power.  The FERC treats deferred income tax as a reduction to the capital rate base used to calculate the approved rate of return on Florida Power's invested capital.  The FPSC treats deferred income tax as zero cost capital, meaning that deferred income tax is used to fund services for the benefit of the ratepayers and no return is collected because it was the ratepayers who supplied the capital.  Customers get the resulting economic benefit in reduced rates.

From 1975 through 1986, Florida Power collected revenues based on a 46-percent Federal income tax rate and increased its deferred income tax account by the amount of tax related to net income accrued for rate-making purposes over the amount accrued for tax purposes.  However, the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 821, 100 Stat. 289, effective for 1987 and

later years, lowered the maximum Federal corporate income tax rates to 39.95 percent in 1987 and 34 percent in 1988. As a result, Florida Power's accumulated deferred income tax balance on December 31, 1986, exceeded the amount of Federal income tax that Florida Power would be expected to pay to the Government in later years. As of December 31, 1986, all deferred Federal income tax expense collected by Florida Power from its retail customers in years prior to 1975 had been completely reversed.

Both the FPSC and the FERC reserve the power to order refunds of excess amounts collected for deferred income taxes. However, TRA section 203(e), 100 Stat. 2146, provides that the normalization provisions of sections 167 and 168 of the Internal Revenue Code would be violated if a utility were to reduce its excess deferred income tax reserve more rapidly than as provided under the average rate assumption method (ARAM). TRA section 203(e) applies to excess deferred income taxes attributable to timing differences related to depreciation and described in sections 167(l) and 168(e)(3) of the Internal Revenue Code (protected excess deferred taxes). Under ARAM, protected excess deferred income taxes can be reversed only as the timing differences that created them reverse.

In addition to protected excess deferred taxes, Florida Power had accumulated excess amounts of deferred income tax for other timing differences not subject to TRA section 203(e)

(unprotected excess deferred taxes). Examples of other timing differences, which created unprotected excess deferred taxes, include deductible State and local tax, certain pension costs, and research and development costs. These costs were deducted for Federal income tax purposes and capitalized for rate-making purposes.

For 1987, the FPSC ordered Florida Power, pursuant to Fla. Admin. Code Ann. r. 25-14.05 (1982) (Fla. Rule 14.05), to return one-fifth of its total excess deferred income tax to its retail customers. Fla. Rule 14.05 generally provided that excess deferred income tax be returned to customers over a period of 5 years. The return amounted to a refund of $2,186,000 of unprotected excess deferred tax and $874,000 of protected excess deferred tax. The refund was made to retail customers in the form of 12 monthly credits on customers' electric bills under the heading "1987 Monthly Rate Reduction".

Florida Power also entered into a settlement agreement with its wholesale customers for a return of excess deferred income tax in 1987. Under the terms of settlement and pursuant to FERC regulation, Florida Power agreed to refund $157,000 to its wholesale customers from its unprotected excess deferred tax and $63,000 from its protected excess deferred tax. The settlement agreement was made effective as of January 1, 1987, but, because the agreement was not finalized until October 9, 1987, credits

that wholesale customers were entitled to receive from January through October were not reflected on those months' bills. To compensate wholesale customers for credits they did not receive, checks were issued to each wholesale customer. The wholesale customers received credits on their November and December bills.

On March 2, 1987, Occidental Chemical Corporation, Florida Power's largest retail customer, filed a complaint with the FPSC alleging that Florida Power's rates should be reduced further in 1988. Fla. Rule 14.05 was repealed on November 10, 1987, because the 5-year refund period violated the ARAM method prescribed by TRA. On January 4, 1988, the FPSC approved a settlement reached by the parties in which Florida Power agreed to refund $18,500,000, the remainder of unprotected excess deferred tax owed to retail customers, and $2,153,000 of protected excess deferred tax to Florida Power's retail customers according to ARAM. The refund was made in the form of 12 monthly credits on customers' electric bills during 1988 under the heading "1988 Monthly Rate Reduction".

In 1988, Florida Power also entered into a settlement agreement with its wholesale customers to refund excess deferred income tax. Under the terms of the 1988 settlement, Florida Power agreed to refund $1,225,000, the remainder of the unprotected excess deferred tax owed to wholesale customers, and $155,000 from its protected excess deferred tax according to

ARAM.  The settlement agreement was made effective as of January 1, 1988, but, because the agreement was not finalized until August 30, 1988, credits that wholesale customers were entitled to receive from January through August were not reflected on those months' bills.  To compensate wholesale customers for credits they did not receive, checks were issued to each wholesale customer.  The wholesale customers received credits on their September, October, November, and December bills.

No interest component was ever included with any refund. Florida Power did not take a deduction for the credits and refund checks.  Instead, the credits and refund checks were netted against taxable revenues for 1987 and 1988, thereby lowering Florida Power's gross income in both years.  The amount of refund that was returned to a particular retail customer was based on the projected amount of electricity to be provided to that customer during the refund period and was not determined by the amount of excess deferred income tax paid, if any, by a particular customer between 1975 and 1986.  In addition, many customers who paid excess deferred income tax between 1975 and 1986 did not receive any refund because they left Florida Power's service area, died, or otherwise terminated their accounts.

Respondent has denied Florida Power the right to relief under section 1341 with respect to the FPSC and FERC 1987 and 1988 returns of excess deferred Federal income tax.

Fuel and Energy Conservation Costs

Both the FPSC and FERC allow Florida Power to charge its customers for its actual, necessary, and prudently incurred fuel costs. Florida Power uses enriched uranium, coal, natural gas, and oil as fuel to generate electricity. The FPSC also allows Florida Power to charge its customers for reasonable and prudent energy conservation costs. Florida Power is required by the FPSC to develop plans for increasing efficiency and decreasing energy consumption within its service area. Reducing the growth rate of electricity demand benefits not only the individual customer, who reduces his demand, but also all other customers on the system, who realize the immediate benefit of reduced fuel costs and the long-term benefit of deferring the need for additional generating capacity.

Fuel costs are recovered from customers through fuel rates set by the FPSC or FERC, which are stated separately on customers' bills. Energy conservation costs are recovered through rates set by the FPSC only. Florida Power is not permitted to mark up or otherwise earn a profit on amounts it charges its customers for fuel or energy conservation costs.

In order to calculate fuel and energy conservation rates, Florida Power must provide the FPSC and FERC with data that estimate fuel costs, energy conservation costs, and projected sales over a 6-month recovery period. Recovery periods run from April through September and October through March. The agencies calculate a fuel and energy conservation cost per kilowatt hour of electricity consumed that remains level over the entire period. The FPSC and FERC have determined that level pricing over a 6-month period is beneficial to customers because it reduces the volatility of customers' monthly bills caused by fluctuating fuel prices and random energy conservation expenditures.

Because the rates approved by the regulatory agencies are based on estimates, the amount billed by Florida Power for fuel or energy conservation costs in a given month may be more or less than the costs actually incurred in that month. However, an over or underrecovery at the close of a given month may be increased or decreased by over or underrecoveries occurring in a subsequent month during the same recovery period. Therefore, any overrecovery balance as of December 31 of any taxable year could be reduced or eliminated as a result of underrecoveries occurring during January, February, or March of the following year but same rate period.

If over and underrecoveries for retail fuel and energy conservation rates do not cancel during a recovery period, the FPSC allows for a "true-up" adjustment during the succeeding two recovery periods. The FERC allows for a true-up rate adjustment for wholesale fuel costs during the single succeeding recovery period. Both the FPSC and FERC require that overrecoveries be returned, and underrecoveries be collected, with interest.

When a customer receives and pays a bill rendered by Florida Power, the bill shows that the portions relating to fuel and energy conservation costs are based on estimates, and, when the estimate is compared to the actual cost of fuel, the customer knows he will be required either to pay more or he will be entitled to a setoff on a future electricity bill. However, the customer does not know the amount of future true-up involved or whether it will result in an additional payment by the customer or an amount received from Florida Power. Funds collected from customers for fuel and energy conservation costs are not segregated in separate bank accounts nor held in trust by Florida Power.

At the end of 1986 and 1988, Florida Power had combined retail and wholesale fuel cost overrecoveries of $11,833,183 and $31,915,284, respectively. At the end of 1987, Florida Power had a combined fuel cost underrecovery of $25,236,199. In 1986, 1987, and 1988, Florida Power had energy conservation cost

overrecoveries of $2,419,002, $509,206, and $1,141,079, respectively. Petitioner included the overrecoveries in income and deducted the underrecovery on its consolidated Federal income tax returns for these years. Respondent has denied petitioner's request to exclude the overrecoveries from gross income.

## Discussion

### Application of Section 1341

Petitioner argues that it is entitled to section 1341 treatment for the amount by which Florida Power reduced utility rates in 1987 and 1988 to compensate for excess deferred Federal income taxes. Section 1341 provides in pertinent part:

> SEC. 1341(a). In General.--If--
>
> (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;
>
> (2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and
>
> (3) the amount of such deduction exceeds $3,000,
>
> then the tax imposed by this chapter for the taxable year shall be the lesser of the following:
>
> (4) the tax for the taxable year computed with such deduction; or
>
> (5) an amount equal to--

(A) the tax for the taxable year computed without such deduction, minus

(B) the decrease in tax under this chapter * * * for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

\*     \*     \*     \*     \*     \*     \*

(b) Special Rules.--

\*     \*     \*     \*     \*     \*     \*

(2) Subsection (a) does not apply to any deduction allowable with respect to an item which was included in gross income by reason of the sale or other disposition of stock in trade of the taxpayer (or other property of a kind which would properly have been included in the inventory of the taxpayer if on hand at the close of the prior taxable year) or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. This paragraph shall not apply if the deduction arises out of refunds or repayments with respect to rates made by a regulated public utility * * * if such refunds or repayments are required to be made by the Government, political subdivision, agency, or instrumentality referred to in such section or by an order of a court, or are made in settlement of litigation or under threat of imminence of litigation.

Petitioner's argument is essentially the same as the argument raised by the taxpayer in <u>MidAmerican Energy Co. v. Commissioner</u>, 114 T.C. ___ (2000), filed this date, and we find no reason to reach a different conclusion in this case. In <u>MidAmerican Energy Co.</u>, a taxpayer-utility held excess deferred Federal income tax after Federal income tax rates were reduced in

1986 pursuant to TRA. The taxpayer was forced by regulatory law to reduce its rates in subsequent years to offset the excess deferred Federal income tax.

A deductible expense is required by section 1341(a)(2) to qualify for relief under the statute. This Court held that the taxpayer's method of decreasing its deferred Federal income tax account resembled a reduction in rates rather than a deductible expense. Factors that led to this Court's conclusion were: First, the taxpayer had returned excess deferred income tax to customer classes based upon current energy consumption, not upon amounts each individual customer actually overpaid during the years of overcollection; second, no interest component was included with the refunds; and, third, the taxpayer set off the amount to be refunded against future amounts owed for goods and services on customers' bills, rather than actually returning money to customers. This Court decided that the taxpayer "was not repaying its customers the excess deferred Federal income tax that it collected in prior years. Rather, the rate reductions served only to reduce income in future years and did not directly compensate * * * [the taxpayer's] customers for prior overcollection." Id. at ___ (slip op. at 26). Because these same factors are present in the case at hand, we conclude that Florida Power's return of excess deferred Federal income tax resembles a reduction in rates rather than a deductible expense.

Although petitioner argues that Florida Power paid a form of constructive interest on deferred income tax because both the FPSC and the FERC calculated allowable rates using formulas that penalized Florida Power for deferred income tax, these rate formulas were used even before TRA triggered the liability to return excess deferred income tax. Therefore, no interest became payable upon the formation of the obligation to return excess deferred income tax, which would have suggested that a liability had arisen at that point in time.

Our holding also applies to the portion of returns made to wholesale customers by check. These returns were carried out by check only because they represented funds that should have been refunded to customers under FERC regulations in previous months. The refund should have been returned to wholesale customers starting 10 months earlier in 1987 and 8 months earlier in 1988. Had Florida Power made these returns in the time required by FERC regulations, they would have been carried out by setoff on customers' bills. Combined with the other characteristics of the refunds, this characteristic makes the returns by check resemble a reduction in rates rather than a deductible expense.

Petitioner also claims that section 1341(b)(2) and section 1.1341-1(f)(2)(i), Income Tax Regs., provide that utility refunds shall be eligible for section 1341 treatment. However, the language of section 1341(b)(2) that refers to utility refunds and

section 1.1341-1(f)(2)(i), Income Tax Regs., does nothing more than create an exception to the exclusion for the sale of inventory items, also found in section 1341(b)(2).  Therefore, although a public utility will not be excluded from the benefits of section 1341 because its refund stemmed from a sale of property characterized as inventory, it still must satisfy all the requirements of section 1341(a) before it is eligible for relief under the statute.  Because the refunds by Florida Power do not meet the deduction requirement, petitioner is not eligible for section 1341 relief.

Inclusion of Overrecovered Costs in Income

The second issue addresses the proper tax treatment of a portion of Florida Power's receipts constituting an overrecovery of fuel and energy conservation costs.

Respondent argues that the claim of right doctrine applies to require inclusion of overrecoveries in income under section 61(a).  According to respondent's view, petitioner would be entitled to a deduction in a subsequent year if and when the overrecoveries are actually refunded to customers.  Respondent contends that overrecoveries are income because the obligation to refund was contingent on no underrecoveries arising in the later months of the recovery period that would reduce or eliminate the amount to be refunded.  Respondent claims that one should look to

the end of a recovery period to determine whether a refund is required.

Petitioner argues that such overrecoveries are not includable in income under section 61(a) because the obligation to repay, imposed by regulatory law, was unconditional. According to petitioner's view, Florida Power is required to refund an overrecovery from any given month in a subsequent month of the same recovery period by setoff or according to the true-up adjustment imposed by regulatory law over subsequent recovery periods. Petitioner claims one should look at a monthly collection to determine whether a refund is required.

Section 61(a) defines gross income as "all income from whatever source derived." Congress enacted this text intending to use the full measure of its taxing power. See Helvering v. Clifford, 309 U.S. 331, 334 (1940). The definition of gross income is construed broadly to reach any accession to wealth realized by a taxpayer over which the taxpayer has "complete dominion". Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). "In determining whether a taxpayer enjoys 'complete dominion', * * * The key is whether the taxpayer has some guarantee that he will be allowed to keep the money." Indianapolis Power & Light Co. v. Commissioner, 493 U.S. 203, 210 (1990).

A claim of right exists when property or funds are received and treated by a taxpayer as belonging to him. See Healy v. Commissioner, 345 U.S. 278, 282 (1953). Income received under a claim of right is taxable in the year of receipt even though the taxpayer may be required to return it at a later time. See North Am. Oil Consol. v. Burnet, 286 U.S. 417, 424 (1932). If, in a subsequent year, the claim to the funds or property is determined to be invalid, the taxpayer would be entitled to a deduction in the year of repayment. However, the amount of tax due and reported in the year of receipt is unaffected by the return of property or funds. See United States v. Skelly Oil Co., 394 U.S. 678, 680-681 (1969). Property or funds are not received under a claim of right when there is a substantial restriction on its disposition or use, or when there is a fixed obligation to return the property or funds received. See Indianapolis Power & Light Co., supra at 209; Hope v. Commissioner, 55 T.C. 1020, 1030 (1971), affd. 471 F.2d 738 (3d Cir. 1973).

In Indianapolis Power & Light Co., the Supreme Court dealt with the issue of whether deposits, paid by customers to assure the taxpayer of payment for future electricity, were required to be included in income. The deposits were received by the taxpayer subject to an express obligation to repay either at the time service was terminated or at the time a customer established good credit. So long as a customer fulfilled his legal

obligation to make timely payments, the deposit ultimately was refunded, and both the timing and method of refund were within the control of the customer. The customer could demand that the taxpayer return the deposit payment by check or by setoff on the customer's next utility bill.

The Court held that the test for whether deposit payments paid by customers constitute income when received by the taxpayer depends upon the rights and obligations of the parties at the time the payments are made. See id. at 211. The Court decided that, because it was within the customer's domain to prevent a forfeiture of a deposit payment and because the customer rather than the taxpayer determined how and when a deposit payment was returned, the payments in question did not constitute income to the taxpayer. Where the time and manner of repayment is within the control of the taxpayer, the payments would constitute income. See Milenbach v. Commissioner, 106 T.C. 184, 197 (1996).

The return of overrecoveries of fuel and energy conservation costs are not within the control of Florida Power. The 6-month recovery period, price setting, and true-up adjustment are all set by the FPSC and FERC, which implemented the pricing schemes to reduce the volatility of customers' bills. Florida Power is required by regulatory law to overcollect for fuel and energy conservation costs in certain months and to return those funds by setoff on customers' bills in the later months of the recovery

period in order to create level pricing. Any remaining overrecoveries existing at the end of the recovery period, because of inaccuracies in estimating its projected costs, are returned to customers pursuant to the true-up adjustment required by the FPSC and FERC. Florida Power cannot change or alter the time or method of refunding the overrecoveries. Because the time and method of refunding overrecoveries is controlled by the FPSC and FERC rather than by Florida Power, Florida Power does not have complete dominion over the overrecoveries and is not required to recognize them as income when received.

Respondent argues that Indianapolis Power & Light Co. does not apply to this case because the Supreme Court was addressing only the question of whether certain payments by customers were advanced payments for services or were deposits. Respondent maintains that, in this case, the overrecoveries were paid to Florida Power as part of the compensation it receives for providing electricity service rather than in the form of a deposit, and, therefore, the test for income announced in Indianapolis Power & Light Co. was not intended by the Supreme Court to apply to overrecoveries.

We reject respondent's argument that the holding in Indianapolis Power & Light Co. should be construed so narrowly. Respondent is essentially making the same arguments in this case regarding overrecoveries that were rejected by the Supreme Court

in Indianapolis Power & Light Co. with regard to deposits. Respondent argues that the overrecoveries should be included in income under section 61 because the overrecoveries are property of Florida Power under a claim of right and subject to a conditional obligation to repay. The conditional obligation to repay vests only if an offsetting underrecovery does not occur before the end of the 6-month recovery period. However, the true economic substance of Florida Power's obligation is that, at the end of the month, Florida Power is not entitled to keep the amount held as an overrecovery, and it must return that amount according to regulatory law either by setoff during the remainder of the recovery period or by the true-up adjustment.

Our decision is consistent with Houston Indus. v. United States, 125 F.3d 1442, 1444 (Fed. Cir. 1997). In Houston Indus., the Court of Appeals held that overrecoveries of fuel costs are not required to be included in income when the overrecoveries are part of a plan to create level pricing over a 12-month recovery period. A taxpayer-utility collected funds from its customers equal to the fuel costs it expected to incur. The collections were based on estimates and were followed by a reconciliation procedure to account for any over or underrecoveries. The governing regulatory agencies required the taxpayer to pay interest on any overrecoveries. The taxpayer argued that it was not required to report in gross income overrecoveries for fuel

costs that were in the taxpayer's possession at the close of the year.  Interpreting Indianapolis Power & Light Co., the Court of Appeals agreed with the taxpayer.

Respondent claims that the outcome of this case should, instead, be controlled by Brown v. Helvering, 291 U.S. 193 (1934).  The taxpayer in Brown was an insurance agent who received a commission from premiums paid on insurance policies.  The insurance policies included a right of cancellation, which, when exercised, required the insurance company to refund the premiums paid.  In the event of cancellation, the taxpayer was required to refund to the insurance company a portion of the commission he had received with respect to a canceled policy.  On his books, the taxpayer recorded an estimate of his future liability to refund commissions and sought to exclude the estimate from gross income.  The Court rejected the argument of the taxpayer stating that "the mere fact that some portion of * * * [the commissions] might have to be refunded in some future year in the event of cancellation or reinsurance did not affect its quality as income."  Id. at 199.

The situation of Florida Power is distinguishable from that of the insurance agent in Brown.  Brown dealt with contingent liabilities that may or may not have vested in future years.  In making his estimates, the taxpayer had no idea which policies, if any, might cancel creating a liability on his part, nor did he

know the amount of his liability at the end of the year. Florida Power, however, is subject to a fixed and certain liability to refund overrecoveries, and those overrecoveries are determinable immediately after receipt of payment by subtracting its collections for a given month by its costs actually incurred.

Our holding is also distinguishable from our opinions in Southwestern Energy Co. v. Commissioner, 100 T.C. 500 (1993), and Continental Ill. Corp. v. Commissioner, T.C. Memo. 1989-636, affd. 998 F.2d 513 (7th Cir. 1993). In Southwestern Energy Co., the taxpayer collected monthly utility fees that were based on the costs that it expected to incur for purchasing gas in the subsequent month. Because the pricing was based on estimates, over or undercollections occurred at the end of every month. At the end of the year, the taxpayer was bound by regulatory law to calculate the net overcollection for the year and return that amount during the following year. Using this collection method, the fuel cost charged to customers by the taxpayer fluctuated each month. The purpose of the monthly gas collections was to allow the taxpayer to recoup its cost of gas purchased and not to create level pricing. This Court held that the obligation to return a net overcollection during the next year was not an immediately deductible expense.

In Continental Ill. Corp., the taxpayer made fixed-term loans with floating interest rates to corporate borrowers.

However, the loan agreements provided that, if the total amount of interest paid by a borrower over the life of the loan exceeded a preset fixed-rate cap, the taxpayer would refund the excess. The taxpayer included in income the amount of interest collected with each monthly payment only to the extent it did not exceed the fixed-rate cap.  Respondent argued, and this Court agreed, that the excess collections should be included in gross income because a contingent obligation to repay does not constitute a restriction on use sufficient to prevent their being classified as income.

The excess collections in Southwestern Energy Co. and Continental Ill. Corp. differ from the excess fuel and energy conservation costs collected by Florida Power in three significant respects.  First, Florida Power is required to pay interest on its overrecoveries, whereas, in Southwestern Energy Co. and Continental Ill. Corp., the taxpayer did not include an interest component in its refunds of excess collections.  Second, Florida Power, burdened by additional accounting and administrative responsibilities, derives no benefit from the regulatory imposed recovery system.  Florida Power is forced by the FPSC and FERC to overrecover its costs and then give refunds in later months in order to reduce the volatility of customers' monthly bills caused by fluctuating fuel prices and random energy conservation expenditures.  The regulatory recovery method is

designed to spread the costs of the expenditures over the 6-month recovery period for the sole benefit of customers. By contrast, the recovery methods in Southwestern Energy Co. and Continental Ill. Corp. benefited only the taxpayer and not the customer. Third, in a subsequent month, if an undercollection occurred in Southwestern Energy Co., or if interest dipped below the fixed-rate cap in Continental Ill. Corp., the taxpayer did not immediately return overcollections from a prior month by setoff. Thus, no refund occurred until the following year in Southwestern Energy Co. or after the end of the loan period in Continental Ill. Corp. In any event, no question was raised or considered whether overrecoveries constituted gross income in the year of receipt.

The final argument of respondent is that, by not including overrecoveries in income, petitioner has improperly changed its method of accounting with respect to a material item without the consent of the Secretary. Consent is required by section 446(e), which reads:

> SEC. 446(e). Requirement Respecting Change of Accounting Method.--Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

"[C]hange in method of accounting" includes a "change in the overall plan of accounting for gross income or deductions or a

change in the treatment of any material item used in such overall plan." Sec. 1.446-1(e)(2)(ii)(<u>a</u>), Income Tax Regs. A material item is defined as "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. When an accounting practice does nothing more than postpone the reporting of income, rather than permanently avoiding the reporting of income over the taxpayer's lifetime, it involves the proper time for reporting income. See <u>Wayne Bolt & Nut Co. v. Commissioner</u>, 93 T.C. 500, 510 (1989). "[C]hange in method of accounting does not include adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction." Sec. 1.446-1(e)(2)(ii)(b), Income Tax Regs.

In <u>Saline Sewer Co. v. Commissioner</u>, T.C. Memo. 1992-236, this Court held that, for purposes of section 446, a question of <u>whether</u> collections should be reported in income is different from a question as to the proper time <u>when</u> collections should be reported in income. If a taxpayer seeks to change his prior reporting position regarding whether a particular item is income or not, a taxpayer is not required to seek the Secretary's permission before filing. Thus, section 446(e) is inapplicable to the reporting of overrecoveries by Florida Power during the years in issue.

We have considered all remaining arguments made by both parties for a result contrary to those expressed herein, and, to the extent not discussed above, they are irrelevant or without merit.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155.</u>